No. 82,610

STATE OF KANSAS, *Appellee*, v. JON L. WHITESELL, *Appellant*.

(13 P.3d 887)

Opinion
filed December 8, 2000.

*Daniel E. Monnat*, of Monnat & Spurrier, Chartered, of Wichita, argued the cause and was on the brief for appellant.

*Charles R. Reimer*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: The appellant, Jon L. Whitesell, appeals his conviction for one count of stalking his wife, Julie Whitesell. Whitesell was sentenced to 60 months of probation. Whitesell raises several issues on appeal. This court has jurisdiction pursuant to K.S.A. 20-3018(c).

The relevant facts of this case span over an 8-year period. Julie met Whitesell in 1989, became pregnant, and married him in 1990. Whitesell and Julie rarely lived together as the relationship was abusive from the start. When Julie and Whitesell did live together, Julie would often flee with her children to her sister's house when Whitesell became violent.

In March 1991, Whitesell became very angry during an argument when he discovered his large hunting knife he kept in his vehicle was gone. Evidently, Julie had taken the knife from the truck. Whitesell subsequently threw Julie into a closet and refused to let her out. Julie eventually fled to her mother's home. When Julie returned home, Whitesell had laid out all the knives in the kitchen in a triangle pattern on her kitchen table. Julie believed that Whitesell was considering either suicide or killing her. Whitesell was hospitalized on March 11, 1991, because his family believed he was suicidal.

In April 1991, while Julie was driving Whitesell from the hospital to another medical appointment, Whitesell became angry, reached over, turned off the vehicle, and pulled her out of her seat. Whitesell got into the driver's seat and started driving very fast. Julie

begged him not to kill her. At a stop light, Julie jumped out of the car and ran away.

During periods of hospitalization in 1991, Whitesell called Julie repeatedly and accused her of having affairs. He told her that he could come and find her if he needed to and that she "has not seen anything yet" if she thought she was afraid of what had happened before.

In June 1991, in a violent rage, Whitesell threw water on Julie while she lay in bed sleeping. Whitesell told Julie that he was taking their daughter. When Julie tried to stop him from driving away, Whitesell pounded her head against the steering wheel, shoved her to the ground, and pulled out her hair. Whitesell also shoved Julie's older daughter against the side of the house. Whitesell was eventually held down, cursing and screaming, by several firemen who had responded to a nearby emergency. Whitesell was arrested and convicted for domestic battery.

In 1992, Julie filed a protection from abuse order. Whitesell subsequently filed for divorce. Later that year, Julie's brother discovered Whitesell attempting to break into Julie's home. Whitesell had also disabled the air conditioner and had previously removed the spark plugs or distributor from Julie's car.

In October 1992, Whitesell dismissed the divorce action and told Julie that marriage was "till death do us part."

On January 20, 1993, Julie filed another protection from abuse order. Two days later, Whitesell pushed Julie, bruising her arm. Whitesell then locked Julie in the bedroom with him, threw her into the corner, and pressed his pelvis against her. Julie believed that Whitesell was going to rape her. Whitesell then threw Julie out into the hall with so much force that Julie's foot went through the wall.

In April 1993, Julie filed for divorce. Whitesell went to Julie's house to talk to her about the divorce and the two engaged in sexual intercourse. Shortly thereafter, Julie discovered that she was pregnant with Whitesell's baby. Julie eventually dismissed the divorce action. Whitesell moved back in to the house with Julie when they discovered that she had been diagnosed with cancer.

In March 1994, Julie became fearful of Whitesell when he became violent and threw a television set. Julie tried to leave the home, but Whitesell slapped her on the back of the head and kicked her. Julie tried to escape to a bedroom with the children but Whitesell kicked in the door. Julie eventually got outside, but Whitesell shoved her and her children to the ground.

Julie then filed another protection from abuse order. In October 1994, Whitesell was arrested for violating the order. Whitesell was angry because Julie had missed a marriage counseling session. Whitesell called Julie and wanted to know where his gun was. He told her, "Since I'm crazy there's no telling what I'll do." Whitesell went to Julie's father's house, beat on the door, and screamed at him to give him his gun. Whitesell then went to Julie's home and broke into the side garage door.

In November 1994, Whitesell returned to Julie's house and tore off a storm drain, broke a flower pot, and kicked in her garage door.

In late 1994 or early 1995, Julie filed a mental commitment on Whitesell. Whitesell called the district attorney's office in a rage and said that he was going to kill Julie and that he had a gun. A few days later Whitesell went to the district attorney's office and told them that he was very angry, that he owned a gun, and that he would kill Julie and himself.

Whitesell was hospitalized from January through March 1995. In August 1995, Whitesell called Julie and threatened suicide. Whitesell was very angry as he had seen Julie with another man. Police officers went to Whitesell's apartment to check on him. Whitesell told officers that he had been hospitalized nine times and that he did not want to go back. Three hours later, after the SWAT team was called in and after police had agreed not to arrest Whitesell or take him to the hospital, Whitesell was taken into custody.

After the August 1995 incident, Julie isolated herself with her children. Julie did not allow her children to ride their bikes and only let them play in the backyard. Julie never opened the blinds or left the garage door open.

In early September 1995, Julie called police and reported that Whitesell was following her, driving by her home, repeatedly call-

ing her, and was checking the tags of cars in her driveway. Whitesell also sent Julie a note referencing spousal abuse and the O.J. Simpson trial which was being televised at the time.

In December 1996, Julie returned to work. Shortly afterwards, Julie began to find suicidal notes from Whitesell taped to the steering wheel of her locked car. In October 1996, Whitesell sent Julie a birthday card telling her "I will not quit!"

In April 1997, Julie filed for divorce a second time. During the 4-month period from March to July 1997, there was a dramatic escalation in Whitesell's activities with Julie. Julie believed that this was prompted by her decision to seek a divorce. Whitesell's actions during this period prompted the district attorney's office to file this stalking case against him. Because several of the issues in this case turn on the particular facts, we will review the events of this period in greater detail.

March 23, 1997. Julie called the police to complain that Whitesell was driving in the area and told police that she was scared of him. Julie told officers that Whitesell had been hospitalized before for "different reasons" and that Whitesell had "homicidal thoughts." As the responding officer left Julie's house, he saw Whitesell driving down the street. The officer pulled Whitesell over. Whitesell explained that he was in the area to check on Julie's safety. Whitesell was arrested for driving on a suspended license.

April 18, 1997. Julie filed a divorce petition and obtained temporary orders notifying Whitesell that his return to said residence without the permission or upon the invitation of the petitioner could be considered as criminal trespass.

April 23, 1997. Julie called the police in the early morning hours to request an "extra watch" on the house. Julie told officers that Whitesell had threatened to harm her throughout the divorce proceedings. Julie told officers that she had seen Whitesell riding a bicycle by her house several times, including the previous evening. Whitesell's parents later stated that Whitesell was on vacation in Albuquerque, New Mexico, with them at the time.

May 11, 1997. Divorce papers with temporary orders were served on Whitesell.

May 25, 1997. While performing a routine patrol at approximately 11:20 p.m., Deputy James Moreland found Whitesell parked down the street about six houses from Julie's house with his lights off. Whitesell had a pair of binoculars in his vehicle. Moreland advised Whitesell to go home. Whitesell told Moreland that he was sad because he wanted to see his children and that Julie had refused to let him see them. Moreland told Whitesell that he was "starting to get close to borderline stalking." Whitesell also told Moreland that he wanted to say a prayer for his children before he left the area; however, Moreland told Whitesell to go home and pray. After Whitesell left, Moreland talked with Julie. Julie was scared and trembling and had a "look of panic on her face." Julie was afraid that Whitesell was going to kill her.

May 31, 1997. Julie called the police to complain that Whitesell was yelling threats at the house; however, Whitesell was not there when the responding officer arrived. Julie told the officer that Whitesell had driven by several times while staring intently. Julie also told the officer that Whitesell pulled up to the front of the house to find Kyle Foland, Julie's new boyfriend, mowing the lawn. Whitesell asked Kyle if he was a Christian and then made crude comments to Julie about what he thought was makeup on her face. Whitesell called Julie a slut and a whore and told her to watch her back. Julie asked the officer to patrol the area occasionally and watch for Whitesell.

June 1, 1997. Julie called the police at 2:24 a.m. to report that she thought she saw Whitesell drive by the house. Deputy Moreland once again responded to the call but could not locate Whitesell. Moreland did find a "trampled down" area in a wheat field near the back yard. Several pop cans were located near the trampled down area. Both Moreland and Julie speculated that the wheat was trampled down by Whitesell while he was watching the house.

June 5, 1997. Julie received a Bible in the mail from Whitesell, along with a copy of the Kansas adultery statute and a note. His handwritten inscription inside the cover of the Bible described how he would not quit and would not be silenced, which frightened Julie.

Later in the day, Whitesell called Julie wanting to see the children. Julie told Whitesell that he could not see the children. In response, he called her an adulteress and then hung up.

June 11, 1997. Julie called the police to report that her oldest daughter saw Whitesell watching her play baseball from across a field. (Julie's oldest daughter is a child by another man.)

June 13, 1997. Julie called police to report that an anonymous person had mailed a postcard to Kyle's brother-in-law, which advised him that Kyle and Julie were having an adulterous affair. The postcard urged the brother-in-law to "confront them both on this matter, witnessing to them the critical nature of this sin and its consequences." When Kyle showed the card to Julie, she was shocked and frightened.

July 4, 1997. Whitesell went to Julie's house in a rental car and told Kyle how much he missed Julie. Whitesell admitted to Kyle that he had hit Julie in the past, but also said that Julie was abusive and that his home was his castle. Whitesell asked Kyle if he would pray with him, which he did.

July 20, 1997. Whitesell drove up and down the street in front of Julie's house several times in the morning. Whitesell then followed Kyle from Julie's house to the Boeing parking lot and confronted him about "screwing his wife." Whitesell told Kyle that "you have nothing to fear but my prayers." Julie called the police to report the incident and also told them that she believed Whitesell was writing down the license numbers of cars which had been at her residence.

The incidents frightened Julie; she lost weight and did not "take care of herself" as she normally did. Julie was afraid of leaving her oldest daughter with her children. She was afraid that Whitesell would attempt to come and talk her daughter into letting him in the house. Julie was terrified that Whitesell was going to attack her or her children.

As a result of Julie's frequent reports in the summer of 1997, Detective Tom Lee compiled all of Julie's past police reports and presented them to the district attorney's office with a recommendation that charges be filed against Whitesell. Charges were filed on July 21, 1997, and Whitesell was arrested the next day. Whitesell

was convicted of stalking between the dates of March 23, 1997, and July 20, 1997. The judgment of the first trial, however, was vacated on jurisdictional grounds. The second trial also resulted in a conviction for one count of stalking. Whitesell was sentenced to 60 months of probation. Whitesell raises several issues on appeal.

## I. CONSTITUTIONALITY OF THE STALKING STATUTE

Whitesell argues that K.S.A. 21-3438 is unconstitutionally vague and overbroad.

Whether a statute is unconstitutionally vague or overbroad is a question of law over which this court has unlimited review. *State v. Rucker*, 267 Kan. 816, 830, 987 P.2d 1080 (1999); *State v. Bryan*, 259 Kan. 143, 145, 910 P.2d 212 (1996); *State v. Adams*, 254 Kan. 436, 438-39, 866 P.2d 1017 (1994).

In *Adams*, we discussed our review of statutes and stated:

" 'The constitutionality of a statute is presumed. All doubts must be resolved in favor of its validity, and before the act may be stricken down it must clearly appear that the statute violates the constitution. In determining constitutionality, it is the court's duty to uphold a statute under attack rather than defeat it. If there is any reasonable way to construe the statute as constitutionally valid, that should be done. A statute should not be stricken down unless the infringement of the superior law is clear beyond reasonable doubt.' " 254 Kan. at 438-39.

Prior to trial, Whitesell filed a motion to dismiss, arguing that K.S.A. 21-3438 is unconstitutionally vague and overbroad on its face and as applied to him. The trial court denied the motion. After trial, Whitesell filed a motion for arrest of judgment, again raising the vagueness and overbreadth issues. The trial court denied the motion.

K.S.A. 21-3438 sets forth in pertinent part:

"(a) Stalking is an intentional, malicious and repeated following or harassment of another person and making a credible threat with the intent to place such person in reasonable fear for such person's safety.

. . . .

"(d) For the purposes of this section: (1) 'Course of conduct' means a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose and which would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the person. Constitutionally protected activity is not included within the meaning of 'course of conduct.'

"(2) 'Harassment' means a knowing and intentional course of conduct directed at a specific person that seriously alarms, annoys, torments or terrorizes the person, and that serves no legitimate purpose.

"(3) 'Credible threat' means a verbal or written threat or a threat implied by a pattern of conduct or a combination of verbal or written statements and conduct made with the intent and the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for such person's safety. The present incarceration of a person making the threat shall not be a bar to prosecution under this section."

## A. VAGUENESS

Whitesell admits that this court recently rejected the vagueness argument in *Rucker* and does not offer anything of substance in the way of new argument on the subject. Arguments which are raised but not briefed will not be considered on appeal. *State v. Pratt*, 255 Kan. 767, Syl. ¶ 4, 876 P.2d 1390 (1994); *McKissick v. Frye*, 255 Kan. 566, 578, 876 P.2d 1371 (1994); *State v. Trudell*, 243 Kan. 29, 38-39, 755 P.2d 511 (1988); Supreme Court Rule 6.02(e) (1999 Kan. Ct. R. Annot. 33).

Nothing has changed since our holding in *Rucker*. In *Rucker*, the appellant challenged the stalking statute on vagueness grounds, arguing that "repeated," "course of conduct," "series of acts," "credible threat," and "legitimate purpose" were unconstitutionally vague. After evaluating case law from other jurisdictions, we held that the language in K.S.A. 21-3438 was not unconstitutionally vague, stating:

"It appears to us that all the amendments made in the 1995 stalking law followed our recommendation in *Bryan*. The majority of jurisdictions with statutes which include these terms have upheld the constitutionality of their statutes and reject vagueness claims. The terms 'repeatedly,' 'apparent authority,' and 'legitimate purpose' when read in conjunction with the rest of the statutory language do not require that a person of common intelligence guess as to their meanings. The terms are defined in relation to an objective standard, the statute contains a credible threat element, and it excludes constitutionally protected conduct. We reject Rucker's claim of vagueness and hold K.S.A. 21-3438 to be constitutional." 267 Kan. at 837.

Pursuant to Supreme Court Rule 6.09(b) (1999 Kan. Ct. R. Annot. 39), Whitesell submitted additional authority concerning the vagueness issue after the briefs were filed. Whitesell points to

*Staley v. Jones*, 108 F. Supp. 2d 777 (W.D. Mich. 2000), in support of his vagueness argument. *Staley* provides nothing in the way of support for Whitesell's argument that the Kansas stalking statute is unconstitutionally vague. Whitesell references footnote 4 in which the *Staley* court states that "the statute provides absolutely no guidance as to what constitutes a 'legitimate purpose.' Therefore, the public and the police are left solely to their own speculative powers to determine the meaning of this clause." There are several problems with Whitesell's argument on this point. First, footnote 4 is merely dicta, as the district court is clearly speculating on what it might decide, had the Michigan Court of Appeals not already decided the issue in *People v. White*, 212 Mich. App. 298, 536 N.W.2d 876 (1995). The dicta in *Staley* is frustrating in that the judge admitted that it is *not* the law but merely what he would decide if there was no controlling precedent. The federal judge noted as much, stating:

"If the *White* interpretation of the statute were not binding on the Court, it would agree that these portions of the statute violate the Due Process Clause. . . . As such, without the *White* interpretation, the Court would agree with *Staley* that the statute fails to meet the basic requirements of the Due Process Clause." 108 F. Supp. 2d at 786, fn. 4.

Second, the opinion in *Staley* is not binding upon this court. Third, this court already determined that the language as currently contained in K.S.A. 21-3438 is not unconstitutionally vague, and without any new substantive argument by Whitesell on this issue, the holding in *Rucker* stands.

B. OVERBREADTH

In *State ex rel. Murray v. Palmgren*, 231 Kan. 524, 533, 646 P.2d 1091 (1982), this court discussed overbroad statutes, stating:

"While a vague statute leaves persons of common intelligence to guess at its meaning, an overbroad statute makes conduct punishable which under some circumstances is constitutionally protected. [Citations omitted.] Obviously, almost every law is potentially applicable to constitutionally protected acts. A successful overbreadth challenge can thus be made only when 1) the protected activity is a significant part of the law's target, and 2) there exists no satisfactory method of severing that law's constitutional from its unconstitutional applications. [Citation omitted.]"

"An overbreadth challenge will be successful if the challenged statute trenches upon a substantial amount of First Amendment protected conduct in relation to the statute's plainly legitimate sweep." *Staley*, 108 F. Supp. 2d at 786 (referring to *Broadrick v. Oklahoma*, 413 U.S. 601, 612-15, 37 L. Ed. 2d 830, 93 S. Ct. 2908 [1973]).

Although the court in *Staley* held that the stalking statute was unconstitutionally overbroad, the opinion is not binding on this court. Furthermore, the reasoning and analysis is questionable at best. After reviewing a significant number of cases on the subject, the *Staley* decision appears to stand in isolation.

A criminal statute should not infringe upon the First Amendment in an unconstitutional manner. The First Amendment, however, is not an impenetrable shield which protects any speech or conduct, whatsoever, with disregard to its harm and effect. Despite our First Amendment rights, we are not free to harm others under the guise of free speech. "As speech strays further from the values of persuasion, dialogue and free exchange of ideas, and moves toward willful threats to perform illegal acts, the State has greater latitude to regulate expression." *People v. Borrelli*, 77 Cal. App. 4th 703, 715, 91 Cal. Rptr. 2d 851 (2000) (referring to *Shackelford v. Shirley*, 948 F.2d 935, 938 [5th Cir. 1991]). "Application of the overbreadth doctrine . . . is, manifestly, strong medicine. It has been employed by the Court sparingly and only as a last resort." *Broadrick*, 413 U.S. at 613. Concerning stalking laws, there must be a balance that is struck between our constitutional right to free speech and our personal right to be left alone. In *Borrelli*, the California appellate court discussed the legislature's ability to criminalize some types of speech and conduct, stating:

" 'Many crimes can consist solely of spoken words, such as soliciting a bribe [citation omitted], . . . or making a terrorist threat [citation omitted]. . . . "[T]he state may penalize threats, even those consisting of pure speech, provided the relevant statute singles out for punishment threats falling outside the scope of First Amendment protection. [Citations omitted.] In this context, the goal of the First Amendment is to protect expression that engages in some fashion in public dialogue, that is ' "communication in which the participants seek to persuade, or are persuaded; communication which is about changing or maintaining beliefs, or taking or refusing to take action on the basis of one's beliefs." ' [Citations omitted.]" . . . A statute that is otherwise valid, and is not aimed at protected ex-

pression, does not conflict with the First Amendment simply because the statute can be violated by the use of spoken words or other expressive activity.' " 77 Cal. App. 4th at 714 (quoting from *Roberts v. United States Jaycees*, 468 U.S. 609, 628, 82 L. Ed. 2d 462, 104 S. Ct. 3244 [1984], and *Aguilar v. Avis Rent A Car System, Inc.*, 21 Cal. 4th 121, 134, 87 Cal. Rptr. 2d 132, 980 P.2d 846 [1999]).

In *Champagne v. Gintick*, 871 F. Supp. 1527 (D. Conn. 1994), the court discussed the legislature's ability to criminalize specific types of speech and conduct, stating:

"Yet this chilling effect raises no constitutional problems because it is well-settled that no one can use constitutional rights to invade the rights of others. As the Supreme Court has repeatedly held, expressive activity may be prohibited if it 'involves substantial disorder or invasions of the rights of others.'

"Moreover, the Supreme Court has held that 'violence or other types of potentially expressive activities that produce special harms distinct from their communicative impact . . . are entitled to no constitutional protection.' " 871 F. Supp. at 1534 (quoting *Tinker v. Des Moines Independent Community Sch. Dist*, 393 U.S. 503, 513, 21 L. Ed. 2d 731, 89 S. Ct. 733 [1969], and *Roberts v. United States Jaycees*, 468 U.S. 609, 628, 82 L. Ed. 2d 462, 104 S. Ct. 3244 [1984]).

The Kansas stalking statute is not unconstitutionally overbroad on its face, as the type of speech and conduct which it prohibits is not the kind protected by the First Amendment. The legislature amended the statute after *Bryan* by specifically noting that "[c]onstitutionally protected activity is not included with the meaning of 'course of conduct.' " K.S.A. 21- 3438(d)(1); see *Rucker*, 267 Kan. at 830. Furthermore, the stalking statute serves a legitimate governmental purpose. As the court in *State v. Ruesch*, 214 Wis. 2d 548, 559, 571 N.W.2d 898 (1997), discussed:

"[The stalking statute] serves significant and substantial state interests by providing law enforcement officials with a means of intervention in potentially dangerous situations before actual violence occurs, and it enables citizens to protect themselves from recurring intimidation, fear-provoking conduct and physical violence."

We also concur with the reasoning and conclusion of the Virginia Court of Appeals in *Parker v. Com.*, 24 Va. App. 681, 691, 485 S.E.2d 150 (1997), when it discussed the legitimate purpose of the Virginia stalking statute, stating:

"The statute's purpose is legitimate: to protect innocent citizens from intentional or knowingly threatening conduct that subjects them to a reasonable fear of physical harm. Furthermore, the statute is tailored so that it does not substantially

infringe upon speech protected by the First Amendment. It regulates the manner in which individuals interrelate with one another and prohibits individuals from communicating with others in a way that is intended or known to cause fear of physical harm. . . . [T]he statute permits all communications between individuals that are conducted in a time, place and manner that do not intentionally or knowingly cause the receiver of the message reasonably to fear for his or her physical safety. The statute's legitimate sweep does not portend any substantial burden on constitutionally protected conduct, and we find no realistic danger that the statute will compromise the First Amendment rights of parties not before the Court."

The overwhelming majority of courts which have addressed this issue have held that stalking statutes which closely resemble the one in Kansas are not unconstitutionally overbroad. See *Culbreath v. State*, 667 So.2d 156, 162 (Ala. Crim. App. 1995) (following the majority of courts and holding that the Alabama stalking statute was not unconstitutionally overbroad); *Borrelli*, 77 Cal. App. 4th at 719 (holding that the stalking statute was not unconstitutionally overbroad as it did not "inhibit a substantial amount of protected speech"); *People v. Baer*, 973 P.2d 1225, 1231-32 (Colo. 1999) (*en banc*) (noting that true threats are not protected by the First Amendment and that the Colorado stalking statute was not unconstitutionally overbroad as it did not "burden a substantial amount of protected speech"); *State v. Marsala*, 44 Conn. App. 84, 96- 97, 688 A.2d 336 (1997) (holding that the Connecticut stalking statute was not overbroad as it does not implicate any first amendment rights); *United States v. Smith*, 685 A.2d 380, 387-88 (D.C. App. 1996) (noting that the stalking statute was limited in its application and holding that it was not unconstitutionally overbroad); *Pallas v. State*, 636 So.2d 1358, 1363 (Fla. Dist. App. 1994) (holding that defendant's First Amendment right to free speech was not impinged as the stalking statute only prohibited conduct "which would cause substantial emotional distress to a reasonable person" and that statute required a "credible threat made with the intent to place the victim in reasonable fear of death or bodily injury"); *Johnson v. State*, 264 Ga. 590, 592, 449 S.E.2d 94 (1994) (holding that Georgia stalking statute was not overbroad); *People v. Cortez*, 286 Ill. App. 3d 478, 481-82, 676 N.E.2d 195 (1996) (holding that the stalking statute only prohibited "culpable conduct" and that it was not unconstitutionally overbroad); *State v. Martel*, 273 Mont.

143, 153, 902 P.2d 14 (1995) (holding that appellant failed to show how stalking statute would substantially limit the First Amendment right to free speech); *State v. Cardell*, 318 N.J. Super. 175, 184-85, 723 A.2d 111 (1999) (holding that there is no constitutional right to threaten people in a manner contemplated by the stalking statute and that the statute was not overbroad); *State v. Smith*, 126 Ohio. App. 3d 193, 210, 709 N.E.2d 1245 (1998) (holding that stalking statute was not overbroad as it did not "criminalize a substantial amount of constitutionally protected activity" and that it validly sought to criminalize behavior which "invades another person's privacy interests"); *State v. Rangel*, 328 Or. 294, 307, 977 P.2d 379 (1999) (holding that stalking statute was not unconstitutionally overbroad even though it did not contain "express exemption for constitutionally protected activity" as it was otherwise narrowly tailored); *Clements v. State*, 19 S.W.3d 442, 451 (Tx. Crim. App. 2000) (holding that stalking statute was not overbroad as placing victim in fear of bodily injury was not constitutionally protected activity); *Parker*, 24 Va. App. at 691 (holding that the stalking statute was not overbroad); *Salt Lake City v. Lopez*, 935 P.2d 1259, 1262-65 (Utah App. 1997) (holding that stalking statute was not unconstitutionally overbroad); *State v. Lee*, 135 Wash. 2d 369, 391-92, 957 P.2d 741 (1998) (recognizing strong interest in right of privacy and holding that stalking statute was not overbroad as it did not infringe upon substantial amount of constitutionally protected behavior); *Brock v. State*, 981 P.2d 465, 470 (Wyo. 1999) (holding that stalking statute was not overbroad as it did "not bring within its ambit activities that constitute an exercise of protected expressive or associational rights").

Whitesell offers nothing in the way of argument on the issue of whether K.S.A. 21-3438 is unconstitutionally overbroad in its application to him. As such, we decline to address this argument. See *Ruesch*, 214 Wis. 2d at 560 (refusing to address overbreadth argument where appellant failed to show how it was unconstitutional as applied to him).

## II. SUFFICIENT EVIDENCE TO SUPPORT
## THE CONVICTION FOR STALKING

Whitesell argues that there was insufficient evidence to support his stalking conviction.

When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Mason*, 268 Kan. 37, 39, 986 P.2d 387 (1999). It is the function of the jury in a criminal case to determine the weight and credit to be given the testimony of each witness. On appellate review, the credibility of witnesses will not be passed upon, conflicting evidence will not be weighed, and all questions of credibility are resolved in favor of the State. *State v. Noriega*, 261 Kan. 440, Syl. ¶ 2, 932 P.2d 940 (1997). A conviction of even the gravest offense may be sustained by circumstantial evidence. *State v. Smith*, 268 Kan. 222, 236, 993 P.2d 1213 (1999).

First, Whitesell argues that the State failed to prove either "following or harassment." Whitesell does not explain why the State failed to prove either a following or harassment but does argue that he had not physically assaulted Julie during the time period contemplated by the complaint. Stalking does not require physical contact. Indeed, one of the purposes of the stalking statute is to criminalize behavior that impinges on one's privacy but which does not cross the line into physical contact. Whitesell's argument on this point is without merit.

Second, Whitesell argues that there was insufficient evidence that he specifically intended to place Julie in fear. Whitesell argues that the State "failed to offer any convincing evidence that Jon desired to place his wife in the mental state required by the statute." Intent may be shown by circumstantial evidence and does not need to be directly proven. See *State v. Wilkins*, 269 Kan. 256, 264-67, 7 P.3d 252 (2000) (intent does not need to be directly proved by the state but can be shown by circumstantial evidence). Whitesell's intent to place Julie in fear could have been inferred

by the jury from the evidence of previous threats and physical attacks upon her, the note sent with the Bible and the adultery statute, Whitesell's actions of following Julie and parking down her street, watching her house, and calling her a slut and a whore when he saw her with Kyle.

Last, Whitesell argues that the State failed to offer any convincing evidence that Jon made a credible threat to Julie. The prior evidence of violence against Julie showed that Whitesell's threats, implied in his written notes, verbal statements to Julie and Kyle, and other pattern of conduct, were credible. Moreover, Whitesell had access to weapons and had used guns in the past when he had threatened suicide.

Whitesell additionally argues that the State improperly relied on his exercise of his First Amendment right to free speech and religion to prove the credible threat element. He presents no authority for his position that his actions in sending Julie the Bible with the threatening note and the adultery statute constitute protected religious activity. Not all forms of speech and conduct are protected by the First Amendment. As we discussed previously in this opinion, the United States Constitution does not protect the threatening speech and conduct evidenced in this case.

There was sufficient evidence, when viewed in a light most favorable to the State, which convinces us that a rational factfinder could have found Whitesell guilty of stalking beyond a reasonable doubt.

## III. ADMISSION OF EVIDENCE

Whitesell argues that the trial court erred in the admission of several key pieces of evidence and that by doing so denied him a fair trial.

The admission of evidence lies in the sound discretion of the trial court. An appellate court's standard of review regarding a trial court's admission of evidence, subject to exclusionary rules, is abuse of discretion. Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. One

who asserts that the court abused its discretion bears the burden of showing such abuse of discretion. *State v. Lumley,* 266 Kan. 939, 950, 976 P.2d 486 (1999); *State v. Cooper,* 252 Kan. 340, 348, 845 P.2d 631 (1993).

The admissibility of physical evidence is determined on the basis of its relevance in connection with the accused and the crime charged. When a physical object is offered into evidence and a question arises as to its connection with either the defendant or the crime charged, unless it is clearly irrelevant, the object should be admitted for such weight and effect as the jury sees fit to give it. *State v. Gardner,* 264 Kan. 95, 104, 955 P.2d 1199 (1998).

## A. NEWS ARTICLES AND O.J. SIMPSON REFERENCE

Whitesell argues that news articles he had clipped and saved in his personal papers were improperly admitted. The articles were about men who had killed their estranged wives or their lovers in domestic abuse situations. The articles were hidden in the attic in a box with Whitesell's personal papers. Whitesell objected to the introduction of the articles at trial. The State argues that the articles show Whitesell's intent. The court also admitted a note that Whitesell had sent Julie in which he stated that "when I get to the apt. I turn on the T.V. I see the Simpson case. And when they examine the spousal abuse issue, I just feel a tremendous amount of shame." According to Julie, she received the "O.J." note in 1995 and found the other articles in 1998, about a year after Whitesell had been arrested and charged with stalking her.

The articles assisted the jury in determining Whitesell's course of conduct and intent towards Julie. Furthermore, both the news articles and the O.J. article are physical pieces of evidence which were not clearly irrelevant. The trial court did not abuse its discretion in admitting either, as it was the onus of the jury to determine their weight.

## B. WHEAT FIELD PATH

Whitesell next argues that the evidence regarding the beaten path in the wheat field was irrelevant because no one had actually seen him walking around out there at night observing the house.

Whitesell objected to the introduction of any evidence concerning the beaten down wheat field path during trial.

The evidence at trial introduced on this issue concerned speculation by both Julie and Deputy Moreland that Whitesell had been standing in the field observing Julie through the kitchen window. This evidence, although not corroborated by any eyewitnesses, shows the level of fear and apprehension that Julie experienced and that she was "alarmed, annoyed, tormented or terrorized" by Whitesell. On cross-examination, counsel was able to set forth for the jury that there were no eyewitnesses who saw Whitesell in the wheat field. The jury was able to properly determine the weight of such testimony.

The trial court did not abuse its discretion in allowing Julie and Moreland to describe to the jury the beaten down wheat field path.

## C. CONCLUSORY STATEMENTS

Next, Whitesell argues that it was improper for the trial court to allow Julie to testify that he had stalked her at the baseball field and to allow Moreland to testify that Whitesell was starting to get close to borderline stalking as these were both legal conclusions to be determined by the jury. Neither of the statements were made to suggest a legal conclusion or to summarize the legality of Whitesell's actions. Moreland's statement to Whitesell was made as a warning that Whitesell should leave the area and that he had no business sitting in his parked car watching Julie's house with binoculars. Julie's use of the word "stalked" came in reference to how she felt when Whitesell was seen watching her daughter at a baseball game. Knowing that Whitesell was there at the game frightened Julie, and when she reported to the police that she felt like she was being stalked, her statement was not a legal conclusion but a representation of her fear.

The trial court did not abuse its discretion in allowing the testimony of Julie and Moreland in which the phrase "stalked" or "stalking" was used.

## D. JULIE'S CANCER

Whitesell argues that it was error for the trial court to allow Julie to testify regarding her cancer when she stated that "I was diagnosed with a tumor in my neck . . . I believed I had cancer . . . " and that "I had surgery for cancer on my lip and my body, and I couldn't be outside." Whitesell argues that it was irrelevant sympathy-begging testimony. Whitesell objected to the testimony at trial.

Julie's statement regarding her cancer arose because Whitesell had believed that she had worn too much makeup and called her a slut and a whore. Julie's lip was dark red because of the cancer, which was an explanation for her appearance, and also the reason Kyle was mowing her lawn. Julie was not supposed to be out in the sun. The trial court did not abuse its discretion in allowing Julie to make statements about her treatment for cancer.

## E. PRIOR ACTS EVIDENCE

Whitesell argues that the trial court erred when it allowed evidence of his behavior towards Julie which occurred prior to the time frame which the complaint alleged the stalking took place. Whitesell objected to the introduction of such evidence prior to trial and again during trial. The trial court denied the objections, stating that "it is incumbent on the State to be allowed to present those [prior acts] to show a pattern and to show the intent during the four-months [in which the stalking was charged]."

Whitesell does not specify in his brief which prior acts evidence he is contesting on appeal. Whitesell merely points to the statement of facts and argues that there should have been no testimony regarding anything which occurred prior to March 23, 1997.

The evidence of Whitesell's behavior towards Julie, prior to March 23, 1997, was relevant to the issue of his intent. The evidence was also relevant as to Julie's fear of Whitesell's "course of conduct" during the time frame suggested in the complaint. Julie's fear for her safety during the March 27, 1997, to July 20, 1997, time frame cannot be adequately measured merely by looking at what occurred between those dates, but must be evaluated by looking at the long-term relationship between Julie and Whitesell. Kan-

sas courts have consistently allowed evidence of "marital discord" between a defendant and a victim for the purpose of showing intent and course of conduct. See *State v. Drach*, 268 Kan. 636, 647-51, 1 P.3d 864 (2000) (allowing evidence of prior abuse and "marital discord" where defendant was charged with murder of his wife); *State v. Rice*, 261 Kan. 567, 585, 932 P.2d 981 (1997) (holding that evidence of previous abuse was admissible to show motive and intent as well as a "continuing course of conduct"); *State v. Humphrey*, 258 Kan. 351, 363, 905 P.2d 664, *modified on other grounds* 258 Kan. 372, 905 P.2d 664 (1995) (holding that trial court did not error where it allowed victim to testify that defendant had previously abused her as it showed a "continuing course of the conduct between the parties"); *State v. Hedger*, 248 Kan. 815, 820, 811 P.2d 1170 (1991) (allowing evidence of prior acts of violence against wife and noting that "evidence of a discordant marital relationship is admissible, independent of [K.S.A. 60-455] to show the ongoing relationship between the parties"); *State v. Taylor*, 234 Kan. 401, 407-08, 673 P.2d 1140 (1983) (holding that trial court did not error when it admitted evidence of prior abuse as the evidence was used to show the relationship between the parties and to show a "continuing course of conduct"); *State v. Green*, 232 Kan. 116, 121, 652 P.2d 697 (1982) (allowing evidence of previous marital altercation between defendant and victim to show motive and intent); *State v. Wood*, 230 Kan. 477, 479-80, 638 P.2d 908 (1982) (noting that it is the rule in Kansas to allow evidence of a discordant marital relationship as such evidence can be relevant to the motive and intent of the defendant); *State v. Anicker*, 217 Kan. 314, 316, 536 P.2d 1355 (1975) (holding that evidence of marital discord was admissible as it showed the intent of the defendant); *State v. Patterson*, 200 Kan. 176, 182, 434 P.2d 808 (1967) (holding that trial court did not error where it allowed testimony of "marital discord" to show motive and intent).

The trial court did not abuse its discretion by allowing evidence of Whitesell's prior acts.

## IV. REFUSING TO GRANT MISTRIAL

Whitesell argues that the trial court erred in refusing to grant

him a mistrial on several occasions.. Specifically, he argues that motions in limine were violated on four occasions; that there were two instances of prosecutorial misconduct; and that there was an instance of juror misconduct, each warranting a new trial.

## A. VIOLATIONS OF MOTION IN LIMINE

The trial court may declare a mistrial when prejudicial conduct makes it impossible to proceed with the trial without injustice to the defendant. K.S.A. 22-3423(1)(c). The decision to declare a mistrial lies within the sound discretion of the trial court and will not be reversed absent a clear showing of abuse of that discretion. *State v. Mayberry*, 248 Kan. 369, Syl. ¶ 8, 807 P.2d 86 (1991); *State v. Massey*, 242 Kan. 252, Syl. ¶ 4, 747 P.2d 802 (1987). The trial court is in the best position to determine if its order in limine has been violated and to determine the degree of prejudice a violation may have caused the accused. *State v. Aikins*, 261 Kan. 346, 378, 932 P.2d 408 (1997).

In *Stayton v. Stayton*, 211 Kan. 560, 562, 506 P.2d 1172 (1973), the court stated:

"Judicial discretion is abused when judicial action is arbitrary, fanciful or unreasonable, which is another way of saying that discretion is abused only where no reasonable man would take the view adopted by the trial court. If reasonable men could differ as to the propriety of the action taken by the trial court then it cannot be said that the trial court abused its discretion. All judicial discretion may thus be considered as exercisable only within the bounds of reason and justice in the broader sense, and only to be abused when it plainly overpasses those bounds."

A party seeking a mistrial has the burden of showing that the party has been substantially prejudiced by the error. *State v. McClanahan*, 259 Kan. 86, 92, 910 P.2d 193 (1996).

### 1. Previous Trial

The trial court ordered that no mention be made of the prior stalking trial in response to a motion in limine filed by Whitesell. Whitesell argues that the order was violated when Julie declared in response to a cross-examination question about the preliminary hearing transcript: "I thought you were talking about the first trial, that I had the—the notes from the first trial." Additionally, Whitesell argues that another violation occurred when Moreland re-

ferred to the prior trial when explaining on cross-examination that he did not know that his photographs of the wheat field path had not turned out "until our first case with this, first trial." Whitesell's motion for a mistrial on both these occurrences was overruled by the trial court.

Whitesell does not explain how these two minor statements by Julie and Moreland prejudiced him or denied him the right to a fair trial, nor why the trial court should have granted him a mistrial on the basis of the testimony. Both statements were inadvertent and had no prejudicial effect on the trial. Whitesell has not met his burden of proof in showing that the statements prejudiced his right to a fair trial. The trial court, therefore, did not abuse its discretion in denying Whitesell's motion for a mistrial.

### 2. Whitesell's Mental Health History

Prior to trial, the court ordered that Julie's references to Whitesell's prior mental health history and hospitalizations be limited to "identifying where he was at." Whitesell argues that the order was violated on several occasions. Specifically, he argues that Julie violated the order when she testified that after a 1991 argument, she "felt like he was anticipating either suicide or killing me." Julie further testified that Whitesell "was very upset and suicidal." Detective Varnell also testified to things which Julie had told him, specifically that Whitesell "had been in the hospital nine times before and has tried suicide once." Detective Moreland testified that Julie "said that [Whitesell] had been hospitalized before and he'd had . . . homicidal thoughts."

Again, although Whitesell points out testimony which may have allegedly violated the pretrial order in limine, he does not provide any analysis explaining how the violations prejudiced him. Julie's direct testimony was not in violation of the pretrial order. Her comments regarding Whitesell being suicidal were not meant to be a clinical diagnosis or any comment on Whitesell's mental health, but relate to her fear of him and represent her lay perception of his mental state.

The comments by Varnell and Moreland cross the line set out by the trial court in this matter concerning Whitesell's mental

health history. The trial court specifically limited any discussion of Whitesell's mental history to Julie's comments regarding his location and mentioning that Whitesell had been hospitalized "nine times"; had "been hospitalized before"; and that he had "tried suicide once" violated the order of the trial court. The impact of the violations, however, was slight, given the overall evidence against Whitesell. The trial court is in the best position to determine the degree of prejudice that the violations caused. We cannot say that the trial court abused its discretion in refusing to grant a mistrial.

### 3. Julie's Brother's Funeral

Prior to trial, the court sustained Whitesell's motion in limine to prohibit Julie from suggesting at trial that Whitesell took advantage of her vulnerability after her brother's death by having sex with her on the night of her brother's funeral. During trial, Julie testified that she became pregnant with her daughter "on November 3rd when I buried my brother." The court denied Whitesell's motion for a mistrial.

Again, Whitesell does not set forth any substantive argument why this statement was prejudicial to him or why the trial court erred in denying his motion for a mistrial. Julie did not testify that she thought Whitesell had taken advantage of her, only that she thought she had conceived her daughter on the night of her brother's funeral. Moreover, the trial court immediately struck Julie's statement when Whitesell made a timely objection. The trial court did not err in refusing to grant a mistrial on this issue.

### 4. Witnesses Being Afraid for Julie's Safety

Prior to trial, the court prohibited the State's witnesses from making conclusory statements that they were afraid for Julie's safety. Kyle testified, however, that "after meeting [Whitesell] . . . I'm still fearful for Julie." Whitesell argues that this violation of the pretrial order warrants a new trial. Whitesell did not object during trial and therefore did not preserve this issue for appeal. Whitesell cannot raise an issue on appeal where no contemporaneous objection was made and where the trial court did not have the opportunity to rule. See *State v. Sims*, 262 Kan. 165, 169-70, 936 P.2d 779 (1997) (failure to object to the admission of

evidence at the trial court level precludes review by an appellate court).

## B. PROSECUTORIAL MISCONDUCT

Whitesell argues that there were two instances of prosecutorial misconduct which were highly prejudicial and which warrant a new trial.

We recently discussed our standard of review for prosecutorial misconduct during closing argument in *State v. Pabst,* 268 Kan. 501, 504-05, 996 P.2d 321 (2000). In *Pabst,* we said:

"Reversible error predicated on prosecutorial misconduct must be of such a magnitude as to deny a defendant's constitutional right to a fair trial. See *State v. Sperry,* 267 Kan. 287, 308, 978 P.2d 933 (1999). Some complained-of prosecutorial statements were not objected to at trial. If the claimed error has been determined to implicate a defendant's right to a fair trial, our standard of review is the same whether or not an objection was made at trial. If the claimed error rises to the level of a denial of the Fourteenth Amendment right to due process, the issue will be addressed. *State v. McCorkendale,* 267 Kan. 263, Syl. ¶ 6, 979 P.2d 1239 (1999).

. . . .

"The analysis of the effect of a prosecutor's alleged improper remarks in closing argument is a two-step process. First, we decide whether the remarks were outside the considerable latitude the prosecutor is allowed in discussing the evidence. In criminal trials, the prosecution is given wide latitude in language and in manner or presentation of closing argument as long as the argument is consistent with the evidence. Second, we must decide whether the remarks constitute plain error; that is, whether they are so gross and flagrant as to prejudice the jury against the accused and deny a fair trial, requiring reversal. *State v. Lumley,* 266 Kan. 939, Syl. ¶ 12, 976 P.2d 486 (1999)."

### 1. Battered Woman's Syndrome

Whitesell first argues that the prosecutor ignored the trial court's order granting his motion in limine prohibiting any reference to battered woman's syndrome. During closing argument, the prosecutor stated:

"What have you learned about the nature of domestic violence in this case? How victims don't report every single thing, how many times that incidents happened that she did not report them. What have you learned about the dynamics of domestic violence? That if there's a violent episode and that he's crying and then I appease him, and then I appease him, it avoids the violence at the end. You have learned about the circle of violence in this case."

Although Whitesell did not object to the prosecutor's closing argument, we must consider the issue in order to determine if it rose to the level of a due process violation.

The prosecutor's statement did not violate the order in limine as it did not specifically mention battered woman's syndrome. The prosecutor was merely commenting on the domestic violence nature of the case and did not inflame, prejudice, or mislead the jury by discussing domestic abuse. The prosecutor was within the "wide latitude" given to her in a criminal trial. This argument is without merit.

2. Future Dangerousness

Whitesell next argues that prosecutorial misconduct took place when the prosecutor, in closing arguments, implied that the only way to protect Julie from any future danger was to find Whitesell guilty. In closing argument, the prosecutor stated:

"You must presume that he is not guilty until you are convinced from the evidence that he is. You should have been convinced after the Moreland call, the videotape car stop, and he continued. If you weren't convinced then, you should have been convinced after the McCaffree call when he—when McCaffree told him stop calling, stop coming by, stop mailing things, and yet he continued to persist after that. It comes out of his own mouth, ladies and gentlemen. He says, I'm not stalking her Marty. I'm not stalking her. Well, Mr. Whitesell, this looks like borderline stalking to me. I didn't mean to scare her. Well, you're scaring her, Mr. Whitesell. You're scaring her. Scout's honor, Marty. This won't happen again. And it did. He stalked her. She was genuinely and reasonably, for somebody who had lived through what she had lived through, afraid. He stalked her."

Whitesell did not object to the prosecutor's statements. Later, during the rebuttal argument, the prosecutor stated:

"When [Whitesell] was attempting to commit suicide in 1995, law enforcement made a promise to him. If you will surrender your gun, we will not take you to the hospital. . . . Law enforcement kept his promise to him. They didn't take him to a hospital. He has not kept his promise to law enforcement. Scout's honor, I won't come back here again. Make him keep his promise and find him guilty of this offense."

The statements by the prosecutor merely sum up the evidence and do not amount to a plea to not allow the type of conduct found objectionable in *State v. Ruff*, 252 Kan. 625, 633, 847 P.2d 1258

(1993). As the stalking charge in this case must focus on a continuing course of conduct, so must the State's evidence and case. The State had to prove that Whitesell had exhibited a pattern of conduct over a period of time which caused Julie to suffer emotional distress. Because part of the element of the crime is a "continuing course of conduct," it was proper for the prosecutor to discuss Whitesell's repeated acts. This argument is also without merit.

## C. JUROR MISCONDUCT

Whitesell's last mistrial argument is that a mistrial should have been granted when it was discovered that one of the jurors had outside communication with a district court judge from another county.

A trial court's decision in ruling on a motion for a new trial on the basis of juror misconduct is subject to an abuse of discretion standard of review. *State v. Arney*, 218 Kan. 369, 372, 544 P.2d 334 (1975). A high degree of appellate deference is allowed a trial judge's exercise of discretion in assessing the texture and feel of the trial, the credibility of witnesses, and the perceived impact of an allegedly prejudicial event. *Saucedo v. Winger*, 252 Kan. 718, 731, 850 P.2d 908 (1993). If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said the trial court abused its discretion. *State v. Lumbrera*, 252 Kan. 54, Syl. ¶ 5, 845 P.2d 609 (1992). Juror misconduct will not constitute a ground for new trial unless it can be shown that the rights of the defendant were substantially prejudiced. The party claiming the prejudice has the burden of proof. *State v. Cady*, 248 Kan. 743, 756, 811 P.2d 1130 (1991). In *State v. Coburn*, 220 Kan. 743, 747, 556 P.2d 376 (1976), this court discussed juror misconduct and stated:

"To warrant reversal of a judgment because of improper contact or communication between juror and an outsider, there must be some showing or indication of injury, actual or potential, to the complaining party, or the act or conduct complained of must be such as to afford reasonable grounds to question the fairness of the trial or the integrity of the verdict, or as would tend to destroy or impair public confidence in trial by jury. [Citation omitted.]"

A few days into the trial, the court announced that a district court judge from another county had informed the court that one of

Whitesell's jurors had initiated a conversation with the judge at a ball game. The juror had commented on the breadth of the evidence and asked why the trial was taking so long, to which the judge responded that "in his jurisdiction it'd be a one-day trial." Whitesell moved for a mistrial claiming that the communication prejudiced his right to a fair trial. The trial court voir dired the juror, asking him whether he thought he could still be impartial. The juror indicated to the court that he was still impartial and could still fairly judge Whitesell. The juror further indicated that he had not discussed any of the evidence of the case with the outside judge. The juror told the court that the outside judge did not give him any information that would affect his ability to be fair and impartial juror for both sides. The trial court subsequently overruled the motion for a mistrial. After the trial, Whitesell moved the court to subpoena the juror for further questioning in order that the effect of the outside communication with the judge might be better determined, which the court denied.

Whitesell has not met his burden of proof in showing that the juror's brief conversation with the outside judge regarding the length of the trial had any prejudicial effect on his trial. This argument is without merit. The trial court did not abuse its discretion in denying Whitesell's motion for a mistrial on the basis of juror misconduct.

## V. THEORY OF DEFENSE

Whitesell argues that the trial court erred when it did not allow him to present his theory of defense.

We review the admission of evidence on an abuse of discretion standard of review. *Lumley*, 266 Kan. at 950; *State v. Bornholdt*, 261 Kan. 644, Syl. ¶ 18, 932 P.2d 964 (1997).

Prior to trial, the court sustained the State's motion in limine to prevent Whitesell from making any reference to the fact that Julie had been in counseling or regarding any opinion of her mental health. Whitesell argues that he was not allowed to present his defense which was:

"(1) Julie's credibility and capability to reliably report and/or interpret [Whitesell's] acts was suspect, given her mental health history; (2) [Whitesell's] intent in

directing his attentions towards her was to reassure her that, despite her instability and past behavior towards him, he would not leave her; and (3) [Whitesell's] prior 'abusive' conduct did not show that he had demonstrated any violent nature sufficient to place Julie in reasonable fear *three years later* when the stalking allegedly occurred, but, rather, [Whitesell's] prior conduct occurred in at least partial response to Julie's prior unstable and anger-driven behavior towards him."

The specific testimony that Whitesell complains of consists of comments on Julie's mental health. Whitesell argues that he should have been allowed to elicit testimony from Deputy McCaffree that Julie's sister had previously reported that Julie "had a history of expressing anger in violent ways in relationships . . . and even her children are scared and tired of her anger." Whitesell also argues that he should have been able to elicit testimony from a police officer who in a police report had noted that "[t]his isn't the first time I've been out to the house. Both have mental problems and can't get along when they are together. She left the home, and I can't tell if his word or he—is he or is [he not] going to file for a divorce. Both weren't sure if they wanted to press charges."

Whitesell's argument is without merit. Julie's history of anger, violence, and mental history are not wholly relevant in this matter. The stalking statute has both a subjective and objective component. The "course of conduct" element requires both a finding by the jury that not only Julie suffered substantial emotional distress but that the actions of Whitesell would cause a "reasonable person" to suffer emotional distress. K.S.A. 21-3438(d)(1). Although Julie's reaction to Whitesell's repeated actions may have been affected by her own mental history, her troubled mental history and violent abusive outbursts do not constitute a "defense" which could assist Whitesell in any way given the evidence and facts of this particular case. The jury had to find that a reasonable person would have suffered emotional distress as a reaction to the repeated acts of Whitesell, which they did. Next, the jury had to find that Julie actually suffered emotional distress, which they did. Julie's mental health history was not relevant to the case as the stalking statute contains an objective component which assists in protecting defendants from false accusations and wild allegations. Furthermore, the jury had the opportunity to evaluate Julie's mental stability and

demeanor for themselves when she took the stand and testified. The jury was capable of giving proper weight to her testimony and discern the nature of her psyche. Julie was thoroughly cross-examined about the reports that she made to the police about Whitesell.

The trial court did not abuse its discretion in refusing to allow Whitesell to elicit testimony regarding Julie's mental health. Whitesell was not denied the ability to present a defense, as the evidence he wished to present had no direct relevance to the elements that the State was required to prove.

## VI. PRIOR CONSISTENT STATEMENTS OF THE VICTIM

Whitesell argues that the trial court impermissibly allowed several witnesses to testify regarding statements that Julie made, as they should have been excluded as hearsay and an improper attempt to bolster Julie's testimony by prior consistent statements.

This issue is reviewed under an abuse of discretion standard of review. *State v. Cooper*, 252 Kan. 340, 348, 845 P.2d 631 (1993).

Prior to trial, Whitesell filed a motion in limine seeking to exclude hearsay evidence, arguing that Julie's prior consistent statements should be excluded as both hearsay and as improper attempts to bolster her credibility. Whitesell argued that "if you put the police on first, the jury gets to hear over and over what Julie has said . . . before I get to cross-examine Julie Whitesell one bit." The trial court overruled the motion.

At trial, Whitesell again objected when several witnesses took the stand and testified regarding statements Julie had made. Each of the witnesses testified before Julie took the stand. The trial court overruled the objections.

Whitesell argues that the trial court erred in allowing the witnesses to testify regarding hearsay statements made by Julie through numerous law enforcement witnesses as well as friends and family members, all before Julie herself testified. Whitesell's key argument is that Julie's testimony was unreliable as it was either "false, exaggerated, and/or paranoid," and that his case was prejudiced as he was not able to cross-examine the declarant until after the 20 witnesses testified as to statements that Julie made to them.

Whitesell correctly notes that prior statements of a witness, consistent with his testimony at trial, are not admissible in corroboration of his testimony unless the witness has been impeached and then only for the purpose of rehabilitating him. *State v. Fouts*, 169 Kan. 686, 696, 221 P.2d 841 (1950).

The statements admitted by the trial court were not used to unfairly corroborate Julie's statements but were used to show the subjective substantial emotional distress element of the stalking charge. K.S.A. 21-3438(d)(1). The statements were not offered to bolster Julie's credibility because they were not offered to assert the "truth of the matter asserted" but to give the jury an idea as to Julie's state of mind and her emotional reaction to Whitesell's actions towards her. Furthermore, the statements were not hearsay because Julie was present at the hearing and available for cross-examination and the statements would have been admissible if made by her while testifying as a witness. *State v. Rice*, 261 Kan. 567, 580-81, 932 P.2d 981 (1997). The fact that a large number of witnesses testified on the stand is also irrelevant, as most of the testimony that is complained of was from officers investigating various calls made to Julie's house. The testimony was voluminous because the incidents were numerous.

The trial court did not abuse its discretion in allowing officers and others to testify regarding Julie's state of mind and in doing so admitting several admissible hearsay statements made by Julie.

## VII. INSTRUCTIONS

Whitesell argues that the trial court erred in refusing his instruction on the elements of stalking and also on refusing to give his instruction regarding the First Amendment defense.

When reviewing challenges to jury instructions, we are required to consider all the instructions together, read as a whole, and not to isolate any one instruction. If the instructions properly and fairly state the law as applied to the facts of the case and a jury could not reasonably have been misled by them, the instructions do not constitute reversible error even if they are in some way erroneous. *State v. Mims*, 264 Kan. 506, 514, 956 P.2d 1337 (1998).

## A. STALKING INSTRUCTION

Whitesell requested instructions regarding the specific aspects of the crime of stalking.

In *State v. Butler*, 257 Kan. 1043, 1066, 897 P.2d 1007 (1995), we discussed the use of Pattern Instructions for Kansas (PIK) by a trial court and stated:

" 'The use of PIK instructions is not mandatory, but is strongly recommended. The pattern instructions have been developed by a knowledgeable committee to bring accuracy, clarity, and uniformity to jury instructions. They should be the starting point in the preparation of any set of jury instructions. If the particular facts in a given case require modification of the applicable pattern instruction or the addition of some instruction not included in PIK, the trial court should not hesitate to make such modification or addition. However, absent such need, PIK instructions and recommendations should be followed. [Citations omitted.]' "

The instruction which the court gave was identical to the one recommended in PIK. See PIK Crim. 3d 56.39. The instruction given by the court was also consistent with the statutory language found in K.S.A. 21-3438. The instruction offered by Whitesell was unduly complicated and was unnecessary. The trial court did not err in using the PIK instruction specifically designed for K.S.A. 21-3438.

## B. FIRST AMENDMENT DEFENSE INSTRUCTION

Whitesell offered the following instruction concerning his First Amendment defense:

"In considering whether the state has proved a 'course of conduct,' you shall not consider the contents of the Bible that Jon Whitesell allegedly sent to Julie Whitesell or the content of the Kansas Statute on Adultery which Jon Whitesell allegedly sent to Julie Whitesell, as these are both constitutionally protected free speech and are excluded from the definition of 'course of conduct.' "

As we noted earlier in this opinion, Whitesell had no First Amendment right to express speech and conduct in a way which was violative of the privacy rights of another. Whitesell cannot use the First Amendment as a shield to protect him from punishment for his harmful criminal behavior. Whitesell was not entitled to an additional instruction on a First Amendment defense. The PIK instruction given by the court specifically addressed the fact that any conduct protected by the First Amendment should be ex-

cluded from course of conduct pursuant to K.S.A. 21-3438(d)(1). See PIK Crim. 3d 56.39. Whitesell's proposed instruction did not cover a defense but inappropriately attempted to make a legal conclusion that his act of sending the Bible and Kansas adultery statute was a constitutionally protected act. The trial court did not error in refusing to give the proffered First Amendment defense instruction.

## VIII. CUMULATIVE ERRORS

Whitesell argues that the cumulative errors deprived him of a fair trial.

Cumulative trial errors may require reversal of a defendant's conviction if the totality of the circumstances substantially prejudiced the defendant and denied him a fair trial. *State v. Wilkins*, 269 Kan. 39, Syl. ¶ 5, 5 P.3d 520 (2000); *Lumbrera*, 252 Kan. at 56-57. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant. *State v. Valdez*, 266 Kan. 774, 802, 977 P.2d 242 (1999).

The evidence of Whitesell's guilt is overwhelming and, as such, there is no relief available based on the cumulative error doctrine.

## IX. 60 MONTHS' PROBATION

Whitesell argues that the trial court erred in sentencing him to 60 months' probation instead of the presumptive sentence of 24 months.

K.S.A. 1999 Supp. 21-4716 governs imposition of departure sentences. The statute provides in pertinent part:

"(a) The sentencing judge shall impose the presumptive sentence provided by the sentencing guidelines . . . unless the judge finds substantial and compelling reasons to impose a departure. If the sentencing judge departs from the presumptive sentence, the judge shall state on the record at the time of sentencing the substantial and compelling reasons for the departure."

K.S.A. 21-4721 provides for the appellate review of departure sentences and provides in pertinent part:

"(d) In any appeal from a judgment of conviction imposing a sentence that departs from the presumptive sentence prescribed by the sentencing grid for a crime, sentence review shall be limited to whether the sentencing court's findings of fact and reasons justifying a departure:

(1) Are supported by the evidence in the record; and
(2) constitute substantial and compelling reasons for departure.
. . . .

"(f) The appellate court may reverse or affirm the sentence. If the appellate court concludes that the trial court's factual findings are not supported by evidence in the record or do not establish substantial and compelling reasons for a departure, it shall remand the case to the trial court for resentencing."

This court has jurisdiction to consider departure sentences. K.S.A. 21-4721(a). A clearly erroneous standard applies to a claim that the evidence was insufficient to justify a departure. *State v. Cox*, 258 Kan. 557, 575, 908 P.2d 603 (1995). A claim that the departure factors relied upon by the court are not substantial and compelling presents a question of law and is reviewed de novo. *State v. Gideon*, 257 Kan. 591, Syl. ¶ 20, 894 P.2d 850 (1995). The term "substantial" means something that is real, not imagined, something with substance and not ephemeral. The term "compelling" implies that a court is forced, by the facts of the case, to leave the status quo or go beyond what is ordinary. *State v. Rhoads*, 20 Kan. App. 2d 790, 799, 892 P.2d 918 (1995). Substantial evidence is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion. *State v. Grady*, 258 Kan. 72, 79, 900 P.2d 227 (1995). If any of the factors cited by the trial court are substantial and compelling reasons for departure, we will affirm that determination. *State v. Zuck*, 21 Kan. App. 2d 597, 606, 904 P.2d 1005, *rev. denied* 258 Kan. 863 (1995). The court's comments at the time of sentencing govern as to the reasons for departure. *Gideon*, 257 Kan. 591, Syl. ¶ 21.

Whitesell's conviction for stalking carried a presumptive guidelines sentence of 2 years' probation. K.S.A. 21-3438(a); K.S.A. 1999 Supp. 21-4611(c)(1). Prior to sentencing, the State filed a motion for a 60-month duration of probation. The trial court granted the motion, sentencing Whitesell to 60 months of probation instead of the presumptive 24 months. In departing from the presumptive sentence, the court merely stated:

"I agree with [counsel for Whitesell] that the law of the state of Kansas is, is that extending probation beyond the statutorily presumed length of time is a departure. I find [the State's] motion to be an appropriate reflection of that requirement, and I find the motion to be both factually and legally sufficient and

I'll adopt the findings of [the State] that are set forth in [the] motion as the findings of the court. I'll find that the facts of this case are substantial and compelling reason for a departure to a 5 year probationary period."

The trial court is required to state for the record the substantial and compelling reasons for the departure at the time of sentencing. In this case, the trial court referenced the State's motion but did not state for the record its reasons for departure. K.S.A. 1999 Supp. 21-4716(a) specifically requires that the court state for the record the substantial and compelling reasons for departure at the time of sentencing. Merely referencing the motion filed by the State does not satisfy the requirements of 21-4716(a). This court will not review the record for aggravating factors which might have justified departure but which the district court failed to articulate. *State v. Salcido-Corral*, 262 Kan. 392, 415, 940 P.2d 11 (1997). We must, therefore, vacate the sentence and remand for resentencing. See *Rhoads*, 20 Kan. App. 2d at 800-01 (where court failed to "articulate reasons" why it imposed departure sentence, proper procedure is to vacate sentence and remand for resentencing); *State v. Peterson*, 22 Kan. App. 2d 572, 576, 920 P.2d 463 (1996) (vacating sentence and remanding for resentencing where court failed to state on the record at the time of sentencing its reasons for departing). On remand, the sentencing court may "cite appropriate reasons justifying the imposition of a departure sentence and impose such a sentence" even though it "fail[ed] to meet the requirements for the imposition of a departure sentence" the first time. *State v. Peterson*, 25 Kan. App. 2d 354, 358, 964 P.2d 695 (1998).

The conviction is affirmed, the sentence vacated, and the case remanded for resentencing.