NOT DESIGNATED FOR PUBLICATION

No. 115,215

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JERAD SANTIAPILLAI,
*Appellant*.

MEMORANDUM OPINION

Appeal from Johnson District Court; JAMES CHARLES DROEGE, judge. Opinion filed May 19, 2017. Affirmed in part, vacated in part, and remanded with directions.

*Michelle A. Davis*, of Kansas Appellate Defender Office, for appellant.

*Jacob M. Gontesky*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., GREEN and MCANANY, JJ.

*Per Curiam*: Jerad Santiapillai was convicted of various charges arising out of his use of a scanning device and an encoder to make fake credit cards containing stolen credit card information in order to make unauthorized cash withdrawals at several ATMs in Overland Park. Santiapillai is a Canadian citizen who legally entered this country on a 6-month visa. But after he was arrested he remained in custody, and by the time of his sentencing, his visa had expired and he was no longer entitled to remain in the United States.

*Facts*

Santiapillai, at age 22, entered the United States in early January 2014, apparently to carry out his illegal scheme. His problems began on the morning of January 28, 2014, when Drug Enforcement Administration (DEA) agent Ronald Kipp stopped at a Commerce Bank drive-through ATM so that his partner could withdraw cash for lunch. As he approached the ATM, Kipp saw Santiapillai standing in the drive-through lane engaged in a transaction at the ATM. When Santiapillai completed his transaction, Kipp pulled up to the ATM, his partner made his withdrawal, and they left.

After leaving the ATM, Kipp saw Santiapillai at another drive-through ATM. Kipp thought this was suspicious, so he parked at a spot where he could watch Santiapillai. He saw Santiapillai walk across a parking lot to a CVS pharmacy. About 1 minute later, Santiapillai left the pharmacy, crossed the parking lot again, and entered a 7-Eleven convenience store. (Kipp later testified that he did not know whether there were ATMs in the pharmacy or the convenience store.) A couple of minutes later, Santiapillai left the 7-Eleven and returned to the original Commerce Bank drive-through ATM to make another transaction. He then walked directly past the driver's side of Kipp's unmarked vehicle toward an adjacent parking lot. Kipp saw that Santiapillai was carrying a small electronic device. Santiapillai was wearing a sweatshirt with a Batman logo. He got into a vehicle in the parking lot and drove off.

Kipp and his partner followed. They called the Overland Park police and gave them the Ontario, Canada, license plate number on Santiapillai's vehicle. Kipp then lost Santiapillai in traffic, so Kipp returned to the DEA office and recounted to other DEA agents what he had observed.

That evening, DEA agent Michael Holder left the office at around 5:30 p.m. and noticed a blue Honda parked in a lot adjacent to a vacant building. The car had an

2

Ontario, Canada, license plate. Holder saw Santiapillai get out of the car and walk 60 to 70 yards to an ATM. Santiapillai was wearing a sweatshirt with a Batman logo. After leaving the ATM, Santiapillai started walking toward his vehicle but turned around and walked away when he saw Holder. Holder drove up to Santiapillai and confirmed that he appeared to be the man described by Kipp. Holder sounded his horn to get Santiapillai's attention and got out of his unmarked vehicle. He showed Santiapillai his badge and asked Santiapillai to talk with him.

Holder saw that Santiapillai was holding a cellphone and about five blank debit cards with a number written on the corner of each of them. The cards did not have any bank logo. When questioned, Santiapillai responded, "'I need to talk to a lawyer.'" Holder placed Santiapillai under arrest and held him for the Overland Park police. An Overland Park officer arrived and took Santiapillai into custody.

The following day, Detective Justin Russell searched Santiapillai's motel room and seized a computer, an encoder, blank gray plastic debit cards, telephones, a black Sharpie marker, and a suitcase containing approximately $82,000 in cash. The police discovered text files containing credit card and PIN numbers. It was determined that the computer's software allowed the encoder to transfer financial data to the blank debit cards. Santiapillai was charged with 1 counts of possession of a scanning device or reencoder, 18 counts of identity theft, and 16 counts of theft.

In October 2014, Santiapillai moved to suppress the evidence obtained after his arrest, arguing that the DEA agents lacked probable cause to arrest him. The court held a hearing on Santiapillai's motion, at which both Kipp and Holder testified. Holder testified that he believed he "had probable cause to arrest [Santiapillai] for either a federal felony for stealing or fraud from a bank, federal institution, or state theft charge" and "probable cause to believe that some nefarious ATM money scheme activity was going on." The district court denied Santiapillai's motion.

In January 2015, well before trial and apparently in anticipation of a conviction, the State moved for an upward dispositional departure, *i.e.*, that Santiapillai not be granted probation but be sent to prison. The State claimed that Santiapillai was not amenable to probation because he was a Canadian citizen and could not be effectively supervised on probation.

The State also moved for a durational departure, arguing that the sophistication of Santiapillai's criminal scheme displayed a greater level of planning or concealment than a typical fraud and that Santiapillai's crimes involved over 50 victims.

Santiapillai waived his right to a jury trial. At the bench trial that followed, the court found Santiapillai guilty of 1 count of possession of a scanning device or reencoder, 18 counts of identity theft, and 12 counts of misdemeanor theft.

*The State's Upward Dispositional Departure Motion*

In advance of Santiapillai's sentencing hearing, the district court received a presentence investigation (PSI) report. The report noted that Santiapillai had no criminal history, either as an adult or juvenile, in either the United States or Canada. The PSI recommended that Santiapillai be placed on probation under supervision of Community Corrections with the following probation conditions:  that Santiapillai (1) not possess or consume alcohol or illegal drugs; (2) submit to breath tests, blood tests, and urinalysis tests at his probation officer's request and at his expense; (3) notify his probation officer of changes in employment, residence, and telephone number; and (4) not contact the victims.

At the time of the sentencing hearing in October 2015, Santiapillai had been in jail for 22 months. David Thomas, the director of Johnson County Court Services with respect to adult offenders, testified at the hearing that a probationer assigned to the

4

Residential Center for a term of probation must seek employment if physically able to work. A probationer "cannot essentially just live at the Residential Center . . . without working." Thomas also explained that the Interstate Compact system generally allows a person who committed a crime in Kansas to serve probation in another state or country. But here, it would be impossible to transfer Santiapillai to Canada for supervision because Canada will not supervise a probationer from the United States unless the probationer is on federal probation.

On cross-examination, Thomas was asked whether there is a rule that noncitizens cannot be supervised by Johnson County Court Services. Thomas responded: "That would be clearly up to the Judge to make that call."

Andrew Zumhofe, a special agent with the Department of Homeland Security, Immigration, and Customs Enforcement (ICE), testified that Santiapillai had not previously entered the country illegally and been deported. Thus, he lawfully entered the United States in January 2014 with a 6-month visa. That was about 3 weeks before the crimes at issue here. But now, at the time of sentencing, Santiapillai's visa had expired and was no longer legally present in the United States. If released from the Johnson County jail and placed on probation, ICE would attempt to locate him and seek to have him deported. With his current status, Santiapillai is not entitled to be lawfully employed in the United States.

The State argued that based on this evidence Santiapillai was not amenable to probation.

> "The State is seeking to depart because it is logically and factually impossible for the defendant to complete a probation. . . . If he's released, he's going to be swiped up by Immigration and Customs and be taken. He cannot physically complete a probation here

5

in the United States. And probation cannot be supervised by another country, specifically in this case, Canada."

Santiapillai's counsel argued that "the factors the State has listed . . . have . . . nothing to do with him being amenable to probation." The court interjected, "[b]ut . . . he has to have a job. . . . Those are the rules."  Santiapillai's counsel continued:

"Amenability is his willingness to participate in and follow the rules of probation as opposed to whether the rules of probation would let him get work."

    . . . .

"[N]ot everybody on probation has to work. That is also per court order. If somebody was disabled, they wouldn't necessarily have to work on probation.

    . . . .

"Mr. Santiapillai is not the first non-US citizen I've had. Certainly all of the non-US citizens I have had haven't gone to prison just because of their immigration status.

    . . . .

"The Court doesn't have to order him to work, to obtain employment. He can still be on probation."

Santiapillai's counsel asked that the defendant be placed at the Residential Center.

The State responded:

"They don't all go to prison and part of that is there are certain individuals who come to this court charged with a crime and before there is ever a disposition of the offense, they go to immigration court and they begin the proceedings and they work on obtaining some sort of a status here and ordinarily by the time an individual here is sentenced on an offense, if they don't have status, they are at least having the wheels turn in immigration court to have a temporary hold so they are not being removed. They, at least, get some sort of a period of time where they can proceed with immigration court hearings. That happens frequently on cases . . . . [B]y the time there is disposition and somebody is

6

seeking probation they have status, temporary status to resolve those issues and be here and work. Mr. Santiapillai does not have that."

*The State's Upward Durational Departure Motion*

The State also moved for a longer sentence than called for under our guidelines. It requested that the court apply at least one of two departure factors taken from the federal sentencing guidelines: the sophistication of the defendant's scheme and the number of victims. The State requested that the court impose a 76-month sentence, a substantial upward departure from a guidelines sentence.

The State called Overland Park Police Detective Justin Russell to testify in support of this motion. Russell worked for a number of years on various federal task forces related to financial crimes. He was involved on a daily basis with identity theft and computer fraud cases.

According to Russell, credit card numbers were compromised by the use of a skimming device at a gas station in Canada which captured information from credit cards when the cards were swiped at a pump. A small camera placed above the pump and focused on the pump's key pad apparently was used to capture PIN numbers. The information collected was communicated to the thief either wirelessly from the device or by removing the device from the pump. The information was stored in an iCloud account and downloaded onto Santiapillai's computer.

After Santiapillai was arrested, Russell searched Santiapillai's hotel room and found software on Santiapillai's computer along with an encoding device that could be used to encode information onto the magnetic strips on blank plastic cards found in Santiapillai's room. The cards Russell found were encoded with credit card numbers. Three days after Santiapillai was arrested, some of the credit cards were still being used

7

in Minnesota, indicating that Santiapillai was part of a larger coordinated operation. In the search of Santiapillai's hotel room, Russell also found about $86,000 in cash which he attributed to ATM withdrawals.

Russell testified that "[t]his is probably one of the more sophisticated cases I've seen just because of locating the encoder and a number of cards that were present at the time." There were 600 credit card numbers in Santiapillai's computer or in the iCloud account.

The State argued that the court should depart on the duration of Santiapillai's sentence based on the factors of the sophistication of the crime and the number of victims. These factors are contained in the federal sentencing guidelines but not enumerated in the nonexclusive departure factors contained in the Kansas sentencing guidelines.

Santiapillai's counsel argued that as stated in *State v. Murphy*, 270 Kan. 804, 19 P.3d 80 (2001), "extra statutory departure factors are subject to stricter scrutiny than those enumerated in the statute." He argued that the use of a computer, an encoder, and encoder software is typical of this type of crime and does not indicate an increased level of sophistication; and while Santiapillai used stolen credit card information, there is no evidence he was the one who originally stole the credit card information. Further, he argued that according to the PSI, there were only two victims:  HSBC Bank Canada and Walmart Canada Bank. Finally, he argued that the legislature understood the nature of this crime—involving a scanning device, re-encoder, and payment—when it defined it as a level 6 felony with presumptive probation "without any accounting for the frequency of usage or the potential loss to victim." He concluded that in "the ID theft statute . . . [t]he legislature made the cutoff at $100,000 . . . [and] made all these offenses presumptive probation."

8

"When we consider the legislative intent, it is clear from the definitions of the encoder statute and the setting of damages at $100,000 for ID theft, that the legislature was aware of what they were doing when they drafted the statutes, yet they declared these statutes to be presumptive probation."

The State responded that had it charged Santiapillai with separate counts for the thefts committed on different days, under the legislature's special rule the conviction on the second count would have meant presumptive prison.

*The Court's Sentence*

Regarding the dispositional departure motion, the court found:

"[T]he State has proven beyond a reasonable doubt that there are no amenable programs for the defendant with regard to a probation in this case and the testimony of Mr. Thomas from the adult probation services has established that as far as providing some sort of a program for probation for the defendant in this case, there is no such program in existence.

"Of course, the State is not required to make a special program for the defendant in this case. And so because—not because that he is an illegal alien, that the Court will not depart based on the fact that he is, in fact, an illegal alien. That is not the reason why the Court is departing.

"The Court is departing because . . . the Court cannot assign the defendant to any kind of a program that currently exists and there is no program that the Court finds would be amenable to probation for this defendant.

"The Court wanted to make a specific comment that it is not because he's . . . a citizen of Canada and not a resident of Kansas that the Court is departing with regard to this dispositional sentence. So probation will not be granted."

The district court also granted the State's motion for a durational departure and imposed a controlling 70-month prison term with 24 months' postrelease supervision. The court also ordered Santiapillai to pay $38,072.25 in restitution to HSBC Bank Canada

9

and Walmart Canada Bank, which apparently was to be paid out of the cash seized from Santiapillai's motel room. Santiapillai's longer-than-guidelines sentence was based on the sophistication of the crime, not the number of victims. The court stated:

> "So, you know, the State was wanting 76 months. The Court imposed a 70-month sentence. I'll just state for the record that the defendant is a 24-year-old man. I guess he might have been 22 at the time this crime was committed, it would appear that that he was caught up in a sophisticated scheme, maybe organized crime of some sort, but he certainly used some very sophisticated methods. The fact that he—at allocution here today he seems like a very intelligent person and maybe this was the only incident that he has gone astray. But, by the same token, this is a very serious type of crime that's going on throughout the United States. Part of it being because the banks and Walmart didn't put in sufficient security to stop that. Every other country in the world was doing that. I'm not blaming the victims in this case because they didn't do this, but certainly if you leave your keys in your car, and somebody who has a [propensity] to commit a crime is going to take that car. That's where Mr. Santiapillai came in. So the Court is going to find that the State has proven sufficiently that there ought to be a departure in this case and the defendant ought to serve the time that the Court has imposed on him."

*This Appeal*

Santiapillai's appeal brings the matter to us. He makes three claims of error: (1) the district court erred in denying his suppression motion; (2) the district court erred in granting the State's dispositional departure motion based on the finding that Santiapillai was not amenable to probation; and (3) the district court erred in not stating on the record substantial and compelling reasons for granting a durational departure.

*Suppression Issue*

With regard to the suppression issue, Santiapillai claims that the authorities lacked probable cause to arrest him and, as a result, the district court should have suppressed all

evidence obtained after his arrest. Because none of the facts is in dispute, our review of this issue is de novo.

The Fourth Amendment to the United States Constitution and § 15 of the Kansas Constitution Bill of Rights protect against unreasonable searches and seizures. "Kansas courts interpret § 15 of the Kansas Constitution Bill of Rights to provide the same protection from unlawful government searches and seizures as the Fourth Amendment." *State v. Neighbors*, 299 Kan. 234, 239, 328 P.3d 1081 (2014). Thus, we are bound by United States Supreme Court precedent regarding Fourth Amendment issues. *State v. Henning*, 289 Kan. 136, 145, 209 P.3d 711 (2009).

Probable cause is the test for a warrantless arrest. As stated in *State v. Hill*, 281 Kan. 136, 146, 130 P.3d 1 (2006),

"Probable cause is the reasonable belief that a specific crime has been or is being committed and that the defendant committed the crime. [Citation omitted.] Probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient to assure a person of reasonable caution that an offense has been or is being committed and the person being arrested is or was involved in a crime. The officer's knowledge must be based on reasonably trustworthy information. To determine whether probable cause exists, an appellate court considers the totality of the circumstances, including all of the information in the officer's possession, fair inferences drawn therefrom, and any other relevant facts, even if they may not be admissible at trial. [Citation omitted.] We view the totality of the circumstances by evaluating the information from the standpoint of an objectively reasonable police officer. [Citation omitted.]"

Here, Holder positively identified Santiapillai as the suspect described by Kipp who appeared to engage in suspicious ATM transactions. Holder witnessed Santiapillai engage in similar activities at drive-through ATMs which Santiapillai approached on foot. The cards Holder saw Santiapillai holding were blank cards without the logo of any

11

bank. Santiapillai's conduct suggested that he was not the owner of the accounts. He parked his car some distance from the ATMs rather than driving up to the ATMs, apparently in an attempt to evade detection from security cameras. Given his personal observations and the information he had from Kipp, a reliable source, Holder reasonably inferred from Santiapillai's conduct that he was making unauthorized withdrawals with the intent to deprive the account holders of their money.

Based on the undisputed evidence, Holder had probable cause to arrest Santiapillai. Accordingly, the district court did not err in denying Santiapillai's motion to suppress.

*Granting the State's Dispositional Departure Motion*

K.S.A. 2016 Supp. 21-6815(a) requires the sentencing court to impose the sentencing guideline's presumptive sentence unless the court finds "substantial and compelling reasons to impose a departure sentence." In reviewing the district court's decision to depart, we review de novo whether a particular mitigating or aggravating factor found by the sentencing court can be a substantial and compelling reason to depart. We use the substantial evidence standard to determine whether the evidence supports the departure factor relied upon by the district court. *State v. Reed*, 302 Kan. 227, 249, 352 P.3d 530 (2015).

A defendant not being amenable to probation is a substantial and compelling reason the court can rely on in deciding to depart from a presumptive sentence of probation. See *State v. Rodriguez*, 269 Kan. 633, 647, 8 P.3d 712 (2000). In *State v. Benoit*, 31 Kan. App. 2d 591, 97 P.3d 497 (2003), we held that a defendant is not amenable to probation when probation is simply impractical or unworkable.

12

Here, the district court's decision to deny presumptive probation was premised on the finding that it would be impossible for Santiapillai to successfully complete probation. Based on the testimony at the sentencing hearing, the court eliminated the possibility of Santiapillai's probation being supervised in Canada, though Santiapillai stated in his allocution that "I am more than willing and capable of paying for a private independent firm [to supervise probation], whether in Kansas or in Canada." The court also found that if Santiapillai served his probation at the Residential Center in Johnson County he would have to work and, having overstayed his 6-month visa (albeit because he was in jail), he could not be lawfully employed. The court stated, "he has to have a job. . . . Those are the rules." Finally, the court reasoned that if Santiapillai was released on probation, it was likely that ICE would detain him and begin deportation proceedings.

The court apparently failed to take into account Thomas' testimony on cross-examination that whether a noncitizen could be supervised by Johnson County Court Services was "clearly up to the Judge." Santiapillai's counsel focused on this point when he argued in opposition to the motion that "not everybody on probation has to work" and whether a probationer has to work depends on the court's order. "The Court doesn't have to order him to work, to obtain employment. He can still be on probation." Besides, if employment was not an option, the district court could have ordered a rigorous course of community service as a viable alternative in a probation plan.

The State argued that probation would be futile because once released from custody Santiapillai likely would be detained by ICE for deportation proceedings. But the backlog of such proceedings is substantial and not all detainees are held until their final deportation hearing. It is not clear that a defendant could not serve a period of probation during the pendency of any deportation proceedings. Finally, unsupervised probation or probation supervised by a court services officer remotely by phone contact with the probationer was a possibility.

13

Ultimately, the propriety of these or other alternatives was a matter for the district court, and we do not suggest that the district court's decision on whether to depart from presumptive probation had to be controlled by any of these alternatives.

Other than a few statutorily required conditions, a district court has broad discretion to impose any probation conditions that it deems proper. *State v. Bennett*, 288 Kan. 86, 91, 200 P.3d 455 (2009). Pursuant to K.S.A. 2016 Supp. 21-6607(c), a district court must always impose six probation conditions, requiring that the defendant:

- Obey the laws of the United States and of Kansas and any other laws to which the probationer is subject;
- Provide reparation or restitution to the victim for the damage or loss the probationer's crime caused unless the court finds compelling circumstances making restitution unworkable;
- Pay a correctional supervision fee, unless waived;
- Reimburse all or part of the expenditures relating to appointed counsel;
- Be subject to searches if there is reasonable suspicion that the probationer has violated the conditions of probation or committed criminal activity; and
- Be subject to random and reasonable drug and alcohol testing.

Beyond these mandatory probation conditions, the "court *may* impose any conditions of probation . . . that the court deems proper." (Emphasis added.) K.S.A. 2016 Supp. 21-6607(b).

Here, we must conclude that the district court failed to take into account the fact that as the sentencing entity it could fashion a probation plan that could have addressed the issues raised by the State's departure motion. In other words, the court's hands were not tied as the State viewed the evidence and as the court seemed to concede in

14

concluding, "Those are the rules." The rules of the Residential Center did not foreclose other alternatives which the court, on further review, may find either viable or not.

Accordingly, we must vacate the district court's order denying presumptive probation and remand for further proceedings on the State's motion for a dispositional departure.

*Failure to State on the Record the Court's Reasons for a Durational Departure*

Santiapillai argues that the district court erred in failing to state on the record the substantial and compelling reasons supporting an upward durational departure. See *State v. Whitesell*, 270 Kan. 259, 294, 13 P.3d 887 (2000).

In reviewing this matter, we must determine whether the district court stated on the record its reasons for a departure. If the district court adequately stated its reasons, we would normally then decide whether substantial competent evidence supports the district court's particular reasons for departing. See *State v. Bird*, 298 Kan. 393, 397, 312 P.3d 1256 (2013). But here, Santiapillai does not argue that the reasons for the court's departure were not substantial or compelling; rather, he contends that the court merely adopted the grounds expressed in the State's departure motion without stating how these grounds constituted substantial and compelling reasons to depart. Thus, he concludes that "[t]he lack of that record raises the concern that the district court did not conduct the full analysis required. This Court must therefore vacate the sentence and remand to the district court for resentencing."

Santiapillai argues that the district court essentially rubber-stamped the State's motion for a durational departure sentence without any explanation. He contends the court granted the State's motion "based upon the 'criteria' in the State's motion;" and that

15

in doing so, "the court failed to enumerate how the State's 'criteria' constituted substantial and compelling reasons for a departure."

But Santiapillai ignores the extensive explanation recited above regarding the district court's finding that its departure ruling was premised on the sophistication of the scheme employed in committing these crimes. We are not persuaded by Santiapillai's claim that the district court erred by not stating on the record its reason for departing.

Affirmed in part, vacated in part, and remanded for further proceedings.