IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 124,412

CITY OF WICHITA, KANSAS,
*Appellee*,

v.

GABRIELLE GRIFFIE,
*Appellant*.

SYLLABUS BY THE COURT

1.

The constitutionality of a statute or ordinance is a question of law subject to unlimited review. The party challenging the statute or ordinance as unconstitutionally overbroad has the burden to establish its overbreadth.

2.

The First Amendment facial overbreadth doctrine departs from the traditional rule of standing that a person may not challenge a statute on the ground that it might be applied unconstitutionally in circumstances other than those before the court.

3.

A First Amendment facial overbreadth analysis consists of three steps. First, the court interprets the language of the challenged law to determine its scope. If the scope of the law extends to prohibit protected activity, the court next decides whether the law prohibits a substantial amount of protected activity judged in relation to the law's plainly legitimate sweep. Finally, if the court finds substantial overbreadth, the court looks to see whether there is a satisfactory method of severing the law's constitutional provisions from its unconstitutional provisions.

4.

A court may sever unconstitutional provisions from a law and leave the remainder in force and effect if, after examining the law, it can conclude (1) the Legislature would have passed the law without the objectionable portion and (2) the law would operate effectively to carry out the intention of the Legislature with the objectionable portion stricken.

Review of the judgment of the Court of Appeals in an unpublished opinion filed November 18, 2022. Appeal from Sedgwick District Court; ERIC WILLIAMS, judge. Oral argument held September 12, 2023. Opinion filed March 15, 2024. Judgment of the Court of Appeals affirming the district court is reversed. Judgment of the district court is reversed.

*Kurt Harper*, of Depew Gillen Rathbun & McInteer, LC, of Wichita, argued the cause, and *Dylan P. Wheeler*, of the same firm, was on the briefs for appellant.

*Nathaniel Johnson*, assistant city attorney, argued the cause, and *Jan Jarman*, assistant city attorney, and *Jennifer Magana*, city attorney, were with him on the briefs for appellee.

*Anthony J. Powell*, solicitor general, *Ryan J. Ott*, assistant solicitor general, and *Kris W. Kobach*, attorney general, were on the brief for amicus curiae State of Kansas.

*Sharon Brett*, of ACLU Foundation of Kansas, of Overland Park, was on the brief for amicus curiae American Civil Liberties Union Foundation of Kansas.

The opinion of the court was delivered by

STANDRIDGE, J.:  This case requires us to decide whether the provision within Wichita Municipal Code of Ordinances (W.M.O.) § 5.24.010(c) criminalizing "noisy conduct tending to reasonably arouse alarm, anger or resentment in others" is unconstitutionally overbroad under the First Amendment. Both the district court and the Court of Appeals held the provision constitutional. We disagree. Applying the substantial

2

overbreadth doctrine used by Kansas courts to adjudicate First Amendment overbreadth challenges, we conclude the noisy conduct provision within W.M.O. § 5.24.010(c) is unconstitutionally overbroad because it prohibits a substantial amount of protected activity in relation to the provision's plainly legitimate sweep. But our conclusion does not require us to strike subsection (c) in its entirety because there is a satisfactory method of severing the unconstitutional "noisy conduct" provision from the constitutional "fighting words" provision within the same subsection.

FACTS

In July 2020, Project Justice ICT (ICT) organized a protest against police brutality in downtown Wichita following the May 2020 murder of George Floyd. Gabrielle Griffie served as the executive director of ICT. She helped coordinate food drives, protests, and community events. *City of Wichita v. Griffie*, No. 124,412, 2022 WL 17072292, *1 (Kan. App. 2022) (unpublished opinion).

ICT promoted the protest on Facebook, informing interested participants to "[b]ring shields, umbrellas, and other protective gear. We will be marching." ICT did not obtain a community event permit to close off streets for the march. But the Wichita Police Department monitored the group's online activity and prepared for the event by blocking off the streets around the group's planned route to limit the amount of contact with motorists. 2022 WL 17072292, at *1.

Between 40 and 60 people showed up to participate in the protest. While marching, they chanted slogans such as, "No justice, no peace," and, "Black lives matter." 2022 WL 17072292, at *1. They also chanted, "Whose streets? Our streets." The streets were "almost entirely empty." 2022 WL 17072292, at *1. Griffie marched at the front, leading the group with a megaphone and a homemade shield. 2022 WL 17072292, at *1.

3

For part of the march, protesters walked in the two middle lanes of the four lanes of traffic along the route. Despite the police traffic diversion, there were some open streets providing access to the marching route. On one of these open streets, Jeremy McTaggart drove a white Chevy Tahoe north on the route into the march.

"LJ," an independent journalist, recorded a video of the protest for an independent group called "Liberty ICT" and posted it to Facebook. Liberty ICT is not part of Project Justice ICT. LJ's recording shows McTaggart honking, slowing his Tahoe, honking again, and then continuing to drive his vehicle until it collided with a protester. The video shows the protester McTaggart hit with his Tahoe becoming visibly irritated with McTaggart. At first, she did not move out of the way. Another protester in the group grabbed her and dragged her out of the way.

The rest of the two-hour recording shows no other traffic confrontations. But the protesters yelled the following at police: "get a real job," "you fascist people," "learn to code," "useless piece of shit," "go home," "fuck you, fascist," "I didn't know pigs knew how to ride bikes," "pigs are smarter than cops," and more.

When the protestors arrived at the federal courthouse, they stood on the front steps and gave speeches to the crowd over megaphones for about 30 minutes. One megaphone-equipped speaker quoted a chant that previously had been used during a protest in Portland, Oregon, "There is no riot here, why are you in riot gear . . . ." A speaker also said, "What did we do, block some fucking streets?" The same speaker mentioned an armed officer's appearance within the courthouse behind them and said, "He's moving to a different tactical position . . . so he can come and fucking blast us if he wants to . . . . What are they going to do? Teargas us when we're just standing around? . . . We need to be out here every fucking day." Based on exhibits the State later presented at trial, this speaker may have been Griffie.

4

Several days after the protest, Detective Marianna Hoyt reviewed the videotape posted on Facebook. Lieutenant Drew Sielor helped Detective Hoyt identify Griffie out of the crowd of protestors. Detective Hoyt ultimately issued Griffie a citation for unlawful assembly under W.M.O. § 5.73.030. The complaint alleged Griffie violated W.M.O. § 5.73.030(1) when she "participat[ed] in the meeting or coming together of at least five persons for the purpose of engaging in *conduct constituting disorderly conduct* . . . by blocking traffic." (Emphasis added.) *Griffie*, 2022 WL 17072292, at *2. To support the unlawful assembly charge, the City of Wichita relied on its disorderly conduct ordinance, W.M.O. § 5.24.010:

> "Disorderly conduct is, one or more of the following acts that the person knows or should know will alarm, anger or disturb others or provoke an assault or other breach of the peace:
>
> "(a) Engaging in brawling or fighting; or
>
> "(b) Disturbing an assembly, meeting, or procession, not unlawful in its character; or
>
> "(c) Using fighting words or engaging in noisy conduct tending to reasonably arouse alarm, anger or resentment in others.
>
> "As used in this section, 'fighting words' means words that by their very utterance inflict injury or tend to incite the listener to an immediate breach of peace.
>
> "Every person convicted of violating this section shall be punished by imprisonment of a term not to exceed 30 days or a fine of not more than $500.00 or both such imprisonment and fine."

PROCEDURAL HISTORY

Griffie appeared for a bench trial in Sedgwick County Municipal Court. The court found Griffie guilty of violating W.M.O. § 5.73.030(1) as charged.

Griffie appealed the municipal court's decision to the Sedgwick County District Court and requested a jury trial. Before trial, the City clarified its theory of the case: Griffie violated the unlawful assembly ordinance by meeting with five or more persons with the intent to engage in "noisy conduct tending to reasonably arouse alarm, anger or resentment in others." In response, Griffie argued that over 40 years ago, the Kansas Supreme Court examined a state statute mirroring the Wichita ordinance and, in order to avoid holding the entire statutory subsection unconstitutional, construed the language in subsection (c) narrowly to mean only "fighting words." See *State v. Huffman*, 228 Kan. 186, 612 P.2d 630 (1980). Based on the holding in *Huffman*, Griffie argued the "noisy conduct" provision in subsection (c) is unenforceable. The district court was not persuaded by Griffie's argument.

The case proceeded to trial. McTaggart testified first, followed by Lieutenant Sielor and Detective Hoyt. The two-hour videotape of the protest was played for the jury. The City rested its case, and Griffie moved for acquittal. The district court denied her motion. Griffie's attorney asked for permission to submit a trial brief for reconsideration, which the court granted. On reconsideration, Griffie argued the "noisy conduct" part of the disorderly conduct definition in subsection (c) is unconstitutionally overbroad and should be struck from the ordinance because it prohibits all noisy conduct, even if the conduct is protected under the First Amendment. The court remained unpersuaded and denied Griffie's motion for reconsideration.

Griffie testified last. She acknowledged her role as the executive director of ICT, though she denied having chosen the position. She believed she was given the position "because nobody else really wanted to do the work" and that it was "forced upon [her]." Griffie testified that ICT's decisions were made as a group. Griffie's time on the stand established that she had told other protestors to bring shields as defensive and symbolic tools, that she wished she would have tried "to keep people more compact or organized,"

6

and that she felt Wichita police targeted her because she was the face of ICT. Griffie also testified about the impact on her resulting from the City's decision to prosecute her for participating in the protest:

> "I don't think in the future I would ever organize any more protests, like, that's just not really my jam. But I think, yeah, eventually I would like to get involved in some other, like, I really enjoyed doing, like, distributions. I really enjoyed, you know, speaking to people on these things, but I don't think protest is the way for me."

A jury found Griffie guilty of unlawful assembly. The court imposed $346.50 in fines and costs. At sentencing, the prosecutor noted Griffie was "a great asset to the community and does a lot of things," and suggested Griffie could do community service rather than paying the fine. The court held Griffie could perform community service, credited at $5 an hour.

Griffie appealed. She argued W.M.O. § 5.24.010(c) was facially unconstitutional under the overbreadth doctrine. While her appeal was pending, we issued a decision in *City of Wichita v. Trotter*, 316 Kan. 310, 514 P.3d 1050 (2022). Griffie submitted a timely Rule 6.09 letter addressing the *Trotter* decision shortly before her Court of Appeals oral argument date.

A divided panel affirmed the district court, finding W.M.O. § 5.24.010(c) survived Griffie's constitutional overbreadth challenge. *Griffie*, 2022 WL 17072292, at *8. Senior Judge Timothy G. Lahey disagreed with the majority:

> "The constitutional problem with the 'noisy conduct' form of disorderly conduct is not that the ordinance was passed with the intention of targeting a specific political message. The problem is that it is overbroad and includes within its scope, without exception, protected First Amendment speech and conduct. Under the ordinance, a criminal penalty attaches to noisy conduct whether it occurs in a private home or in the public square—it

7

applies to political debates, meetings, and conventions, and at all times of the day or night. The scope is constitutionally significant and unmistakably chills free speech and expressive conduct." *Griffie*, 2022 WL 17072292, at *9.

Griffie petitioned for review, asking this court to reverse the Court of Appeals and adopt Judge Lahey's reasoning. The Attorney General and ACLU filed briefs as amicus curiae, supporting the City and Griffie respectively.

Jurisdiction is proper. See K.S.A. 20-3018(b) (providing for review of Court of Appeals' decisions); K.S.A. 60-2101(b) (Supreme Court can correct, modify, vacate, or reverse Court of Appeals' decisions).

ANALYSIS

Griffie claims the "noisy conduct" provision of W.M.O. § 5.24.010(c)—which defines the disorderly conduct element on which her unlawful assembly conviction was based—is overbroad on its face such that it unconstitutionally infringes on freedom of speech and expression protected by the First Amendment. Griffie reiterates she brings only a facial challenge to the constitutionality of the ordinance and is not challenging the constitutionality of the ordinance as applied to her conduct here.

A. *Standard of review*

The constitutionality of a statute or ordinance is a question of law subject to unlimited review. *Trotter*, 316 Kan. at 312. As the party challenging the ordinance as unconstitutionally overbroad, Griffie has the burden to establish its overbreadth. See 316 Kan. at 314.

8

B. *Standing*

Before addressing the merits of Griffie's overbreadth claim, we first consider whether Griffie has standing to challenge W.M.O. § 5.24.010(c) as unconstitutionally overbroad. Although the parties do not raise it, "standing is a component of subject matter jurisdiction" and "may not be waived." *Creecy v. Kansas Dept. of Revenue*, 310 Kan. 454, 459-60, 447 P.3d 959 (2019).

Under Kansas' traditional standing test, parties must demonstrate they *personally* "suffered a cognizable injury" and "a causal connection between the injury and the challenged conduct." *State v. Bodine*, 313 Kan. 378, 385, 486 P.3d 551 (2021). As such, a party generally has standing to challenge the constitutionality of an ordinance or statute only to the extent it adversely impacts that party's own rights. So "if there is no constitutional defect in the application of the statute to a litigant, [the litigant] does not have standing to argue that it would be unconstitutional if applied to third parties in hypothetical situations." *Ulster County Court v. Allen*, 442 U.S. 140, 154-55, 99 S. Ct. 2213, 60 L. Ed. 2d 777 (1979).

But the United States Supreme Court recognizes an exception to traditional standing rules when a litigant claims that a statute broadly prohibits speech protected by the First Amendment. *City of Wichita v. Wallace*, 246 Kan. 253, 267, 788 P.2d 270 (1990) (citing *Young v. American Mini Theatres*, 427 U.S. 50, 60, 96 S. Ct. 2440, 49 L. Ed. 2d 310 [1976] [citing *Broadrick v. Oklahoma*, 413 U.S. 601, 611-14, 93 S. Ct. 2908, 37 L. Ed. 2d 830 (1973)]). This exception grew out of the notion that violations of the First Amendment impact society as a whole by exerting a chilling effect on the free and open exchange of ideas. See *Wallace*, 246 Kan. at 267. Therefore, litigants "are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or

9

expression." *Broadrick*, 413 U.S. at 612. This court first applied the relaxed standing rules for First Amendment overbreadth challenges in *Moody v. Board of Shawnee County Comm'rs*, 237 Kan. 67, 75, 697 P.2d 1310 (1985), and most recently applied the exception in *Trotter*, 316 Kan. at 312.

Here, Griffie brings an overbreadth challenge to an ordinance seeking to protect First Amendment rights. Thus, her claim fits squarely within the exception to general standing requirements, and she has standing to argue on behalf of third parties that W.M.O. § 5.24.010(c) is unconstitutionally overbroad on its face.

C. *Overbreadth*

Griffie claims the "noisy conduct" provision of W.M.O. § 5.24.010(c) is facially overbroad and thus unconstitutional. To determine whether the ordinance is overbroad, we apply the facial overbreadth standard as developed in Kansas cases. The Kansas standard evolved over several decades, incorporating criteria from legal treatises and several United States Supreme Court cases along the way. Perhaps this extended evolution is why our current overbreadth standard appears, at least on its face, to be internally incongruous. In practice, however, Kansas courts have reconciled the incongruity. To place the current overbreadth standard in context so that we can apply it here, we begin with a chronological review of key substantial overbreadth legal principles as developed in the Supreme Court and in Kansas.

*Evolution of the United States Supreme Court substantial overbreadth doctrine*

Without labeling it as such, the United States Supreme Court first recognized what is now known as the facial overbreadth doctrine in *Thornhill v. Alabama*, 310 U.S. 88, 97-98, 60 S. Ct. 736, 84 L. Ed. 1093 (1940). In that case, Thornhill was arrested under a statute broadly criminalizing all picketing, including labor-management disputes. In

10

response, Thornhill alleged violations of his constitutional right to free speech, to peacefully assemble, and to petition for redress. The State argued the law was vital in keeping the community safe and maintaining the peace. Finding no merit to his constitutional claims, the trial court convicted Thornhill as charged.

In reversing the lower court, the Supreme Court established some significant legal principles of lasting importance. First, the Court held a First Amendment overbreadth challenge to a statute must be "judged upon its face" and not as applied to the particular facts of a case. 310 U.S. at 96. Next, the Court held a law is overbroad when it "does not aim specifically at evils within the allowable area of [governmental] control, but . . . sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech or of the press." 310 U.S. at 97. Finally, and probably most significantly, the Court created an exception to ordinary standing requirements in First Amendment overbreadth cases by permitting facial challenges to overbroad statutes even if a more narrowly drawn statute would have been valid as applied to the challenging party. 310 U.S. at 97-98.

Thirty years after *Thornhill*, the Supreme Court defined the limits of the facial overbreadth doctrine in the seminal case of *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S. Ct. 2908, 37 L. Ed. 2d 830 (1973). The case involved a challenge to the provision of a statute restricting political activities of the state's classified civil servants. The Court held the overbreadth doctrine inapplicable, noting it generally does not apply to a law that may only incidentally have an impact on expression. In so holding, the Court established the "substantial overbreadth" doctrine, declaring that "particularly where conduct and not merely speech is involved, . . . the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." 413 U.S. at 615. This inquiry necessarily involves a comparative analysis between the law's effect on protected versus unprotected activity and requires that the unconstitutional

11

applications of the law be disproportionately "substantial" in relation to the constitutional applications. 413 U.S. at 609-18.

Not long after *Broadrick*, the Supreme Court incorporated the substantiality requirement into all overbreadth challenges, whether the statute applies to conduct, speech, or conduct plus speech. *New York v. Ferber*, 458 U.S. 747, 770-71, 102 S. Ct. 3348, 73 L. Ed. 2d 1113 (1982) (recognizing the substantiality requirement applies equally to overbreadth challenges involving pure speech or speech-related conduct); *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 503 n.12, 105 S. Ct. 2794, 86 L. Ed. 2d 394 (1985) (reiterating *Ferber*'s holding that the substantial overbreadth doctrine applies to pure speech).

Fifty years after *Broadrick*, the United States Supreme Court continues to adhere to the substantial overbreadth doctrine. See *United States v. Hansen*, 599 U.S. 762, 770, 143 S. Ct. 1932, 216 L. Ed. 2d 692 (2023) ("If the challenger demonstrates that the statute 'prohibits a substantial amount of protected speech' relative to its 'plainly legitimate sweep,' then society's interest in free expression outweighs its interest in the statute's lawful applications, and a court will hold the law facially invalid.").

*Evolution of the Kansas substantial overbreadth doctrine*

The first Kansas case setting forth specific standards in a First Amendment overbreadth challenge is *State ex rel. Murray v. Palmgren*, 231 Kan. 524, 646 P.2d 1091 (1982). In *Palmgren*, the Attorney General sought to recover civil penalties against county officials for violating the Kansas Open Meetings Act (KOMA). The county officials argued KOMA was unconstitutionally overbroad in that it "has a potential inhibiting effect on the 'rights of public officials to assemble and discuss public affairs'" and thwarts the rights of Kansans to engage in "unfettered discussion of governmental affairs in private while retaining anonymity." 231 Kan. at 533-34.

12

The *Palmgren* court began its overbreadth analysis by setting forth the existing, and rather general, legal standard for overbreadth:  "[A]n overbroad statute makes conduct punishable which under some circumstances is constitutionally protected." 231 Kan. at 533 (citing *State v. Huffman*, 228 Kan. 186, 189, 612 P.2d 630 [1980]; *State v. Stauffer Communications, Inc.*, 225 Kan. 540, 547, 592 P.2d 891 [1979]). The court went on to note, however, that "almost every law is potentially applicable to constitutionally protected acts." 231 Kan. at 533. Thus, the court clarified that a successful overbreadth challenge can be made only when "1) the protected activity is a significant part of the law's target, and 2) there exists no satisfactory method of severing the law's constitutional from its unconstitutional applications." 231 Kan. at 533. *Palmgren* derived these prerequisites to a successful overbreadth challenge from a discussion on the standing component of overbreadth challenges by Professor Lawrence Tribe in his treatise, American Constitutional Law. *Palmgren*, 231 Kan. at 533 (citing Tribe, American Constitutional Law § 12-24, 711 [2d ed. 1978]). Notably, Tribe also discussed *Broadrick* and its comparative substantiality requirement. But the *Palmgren* court did not discuss the substantial overbreadth standard or cite *Broadrick* for this legal principle.

Almost two decades after *Palmgren*, we applied the United States Supreme Court's comparative substantial overbreadth doctrine for the first time. *State v. Whitesell*, 270 Kan. 259, 271, 13 P.3d 887 (2000) ("An overbreadth challenge will be successful if the challenged statute trenches upon a substantial amount of First Amendment protected conduct in relation to the statute's plainly legitimate sweep.") (citing *Staley v. Jones*, 108 F. Supp. 2d 777, 786 [W.D. Mich. 2000] [citing *Broadrick*, 413 U.S. at 612-15]). Since *Whitesell*, Kansas appellate courts have consistently held that a statute is overbroad only when it prohibits a substantial amount of protected expressive activity when judged in relation to the statute's plainly legitimate sweep. See *Trotter*, 316 Kan. at 314; *State v. Jones*, 313 Kan. 917, 932, 492 P.3d 433 (2021); *State v. Williams*, 299 Kan. 911, 920, 329 P.3d 400 (2014); *State v. Zabrinas*, 271 Kan. 422, 428, 24 P.3d 77 (2001); *City of Wichita*

13

*v. Trotter*, 60 Kan. App. 2d 339, 361, 494 P.3d 178 (2021); *Griffie*, 2022 WL 17072292, at *4; *State v. Neloms*, No. 110,391, 2016 WL 463362, at *9 (Kan. App. 2016) (unpublished opinion); *State v. Bland*, No. 108,272, 2014 WL 1362644, at *4 (Kan. App. 2014) (unpublished opinion); *State v. Gile*, No. 108,279, 2014 WL 1302608, at *7 (Kan. App. 2014) (unpublished opinion).

But alongside the comparative substantial overbreadth doctrine, our courts have also continued to cite *Palmgren*'s overbreadth standard, derived from Tribe's treatise. Because the two standards use different criteria to assess overbreadth, we question whether using them together can be reconciled. A plain reading of the language in the two standards shows the difference between them. Under the substantial overbreadth doctrine, a law is overbroad if it prohibits a *substantial* amount of protected activity *as compared to* the amount of unprotected activity it prohibits. Under the Tribe overbreadth doctrine, a law is overbroad if the protected activity is a *significant* part of the law's target, *with no comparison* to the amount of unprotected activity it prohibits.

Although they may be irreconcilable in the abstract, we find Kansas courts have reconciled the two standards in practice by incorporating the secondary Tribe standard into the primary substantial overbreadth doctrine. For example, in *Williams* we held

> "[w]here conduct and not merely speech is involved, the United States Supreme Court requires that 'the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.' *Broadrick*, 413 U.S. at 615. This court has divided this burden into a two-part test. The party attacking the constitutionality of a statute on the basis of overbreadth must establish '(1) the protected activity is a significant part of the law's target, and (2) there exists no satisfactory method of severing that law's constitutional from its unconstitutional applications.'" 299 Kan. at 920 (citing *Whitesell*, 270 Kan. 259, Syl. ¶ 6).

14

This excerpt from *Williams* reflects that, at least where conduct and not merely speech is involved, we have construed Tribe's "significant part of the law's target" standard as a legal equivalent to the Supreme Court's substantial overbreadth doctrine. See *Broadrick*, 413 U.S. at 615 ("[P]articularly where conduct and not merely speech is involved, . . . the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep."). This construction may suggest we are not applying the required Supreme Court's substantial overbreadth doctrine. See *Arizona v. Evans*, 514 U.S. 1, 8-9, 115 S. Ct. 1185, 131 L. Ed. 2d 34 (1995) ("State courts . . . are not free from the final authority of" the Supreme Court when interpreting the U.S. Constitution.); *State v. Tatro*, 310 Kan. 263, 272, 445 P.3d 173 (2019) ("[T]his court must follow the United States Supreme Court's interpretation of the United States Constitution."). To clarify that we are, indeed, applying United States Supreme Court precedent on questions of federal law, we no longer will express the substantial overbreadth doctrine as a standard requiring protected activity be a "significant part of the law's target." Instead, we will apply the doctrine using the same language as the Supreme Court to determine whether the law prohibits "a substantial amount of protected activity judged in relation to the law's plainly legitimate sweep." Consistent with Supreme Court precedent, we will apply the substantial overbreadth doctrine not just to conduct, but also to overbreadth challenges involving conduct, speech-related conduct, and pure speech. *Ferber*, 458 U.S. at 770-71 (recognizing the substantiality requirement applies not just to conduct, but equally to overbreadth challenges involving pure speech and speech-related conduct); *Brockett*, 472 U.S. at 503 n.12 (reiterating *Ferber*'s holding that the substantial overbreadth doctrine applies to pure speech).

Thus, the First Amendment facial overbreadth analysis consists of three steps. First, we interpret the language of the challenged law to determine its scope. See *United States v. Williams*, 553 U.S. 285, 293, 128 S. Ct. 1830, 170 L. Ed. 2d 650 (2008) ("The first step in overbreadth analysis is to construe the challenged statute; it is impossible to

15

determine whether a statute reaches too far without first knowing what the statute covers."). If the scope of the law extends to prohibit protected activity, we next decide whether the law prohibits a substantial amount of protected activity judged in relation to the law's plainly legitimate sweep. *Williams*, 299 Kan. at 920; see also *Williams*, 553 U.S. at 297; *Ferber*, 458 U.S. at 771 (recognizing the substantiality requirement applies not just to conduct, but equally to overbreadth challenges involving pure speech and speech-related conduct). Finally, if we find substantial overbreadth, we look to see whether there is a satisfactory method of severing the law's constitutional provisions from its unconstitutional provisions. *Trotter*, 316 Kan. at 320-21.

Having clarified the substantial overbreadth doctrine as applied by Kansas appellate courts, we now apply the overbreadth analysis to the noisy conduct provision of W.M.O. § 5.24.010(c).

1. *Interpreting the language of the ordinance to determine its scope*

The most fundamental rule of statutory interpretation is that the intent of the Legislature governs if that intent can be determined. To determine intent, we look first to the plain language of the statute, giving common words their ordinary meanings. When a statute is plain and unambiguous, we do not speculate about the legislative intent behind that clear language, and we avoid reading something into the statute not readily found in its words. *State v. Eckert*, 317 Kan. 21, 27, 522 P.3d 796 (2023). Our court applies the same rules to interpreting a municipal ordinance as we would when interpreting a statute. *Robinson v. City of Wichita Employees' Retirement Bd. of Trustees*, 291 Kan. 266, 272, 241 P.3d 15 (2010).

Using these rules of statutory interpretation, we review W.M.O. § 5.24.010(c) to determine the scope of activity prohibited by the ordinance:

"Disorderly conduct is, one or more of the following acts that the person knows or should know will alarm, anger or disturb others or provoke an assault or other breach of the peace:

. . . .

"(c) Using fighting words or engaging in noisy conduct tending to reasonably arouse alarm, anger or resentment in others."

Neither the ordinance nor the identical state statute, K.S.A. 21-6203, define "noisy conduct." And no case interpreting the ordinance or statute has defined the phrase either. But Kansas courts interpreting statutes often look to dictionaries to explain the ordinary meaning of common words. See *Eckert*, 317 Kan. at 29-30.

"Noisy" means "making noise." Noisy, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/noisy. In turn, noise is defined as "sound" . . . "especially: one that lacks an agreeable quality or is noticeably unpleasant or loud." Noise, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/noise.

"Conduct" is defined as "a mode or standard of personal behavior especially as based on moral principles." Conduct, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/conduct. Black's Law Dictionary further defines "conduct" as "[p]ersonal behavior, whether by action or inaction, verbal or nonverbal; the manner in which a person behaves." Black's Law Dictionary 369 (11th ed. 2019).

Using these dictionary definitions to construe the "noisy conduct" provision of W.M.O. § 5.24.010(c), the ordinance criminally punishes a person who makes disagreeable, unpleasant, or loud sounds that the person knows or should know would tend to reasonably arouse alarm, anger, or resentment in others. By its plain language then, the "noisy conduct" provision of W.M.O. § 5.24.010(c) necessarily criminalizes

17

conduct previously deemed by the United States Supreme Court as protected by the First Amendment, if accompanied by a disagreeable, unpleasant, or loud sound:

- picketing a military funeral of a soldier killed in the line of duty with signs stating, "Thank God for Dead Soldiers," and, "America is Doomed," while singing hymns and reciting Bible verses, *Snyder v. Phelps*, 562 U.S. 443, 448, 131 S. Ct. 1207, 179 L. Ed. 2d 172 (2011);

- burning a cross while playing religious hymns, such as "Amazing Grace," over loudspeakers, without an intent to intimidate, *Virginia v. Black*, 538 U.S. 343, 349, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003);

- burning an American flag during a protest rally, while protesters chant: "America, the red, white, and blue, we spit on you," *Texas v. Johnson*, 491 U.S. 397, 399, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989);

- giving a lengthy and aggressive religious speech and loudly singing "The Star Spangled Banner" and other patriotic and religious songs while stamping feet and clapping hands, *Edwards v. South Carolina*, 372 U.S. 229, 233, 83 S. Ct. 680, 9 L. Ed. 2d 697 (1963); and

- peaceful labor picketing, including assembling and discussing publicly the nature and causes of a labor dispute. *Thornhill v. State of Alabama*, 310 U.S. 88, 104, 60 S. Ct. 736, 84 L. Ed. 1093 (1940).

Given Supreme Court precedent and the plain language of the ordinance, we conclude the scope of the ordinance extends to constitutionally protected activity.

2. *Whether the ordinance prohibits a substantial amount of protected activity judged in relation to the law's plainly legitimate sweep*

Having concluded the scope of the law extends to prohibit constitutionally protected activity, the next step in our analysis is to determine whether the ordinance is substantially overbroad and therefore unconstitutional. A law is overbroad if it prohibits a substantial amount of protected activity judged in relation to the law's plainly legitimate sweep. The overbreadth inquiry necessarily involves a comparative analysis between the law's effect on protected versus unprotected activity and requires that the unconstitutional applications of the law be disproportionately "substantial" in relation to the constitutional applications.

We begin by looking at the effect of the ordinance on protected activity. On top of activity deemed by the Supreme Court as protected by the First Amendment set forth in the preceding section, the plain language of the ordinance reflects that the "noisy conduct" provision W.M.O. § 5.24.010(c) criminalizes a broad range of other constitutionally protected activities—whether expressed in public or private settings and whether expressed at any time during the day or the night. If expressed in a disagreeable, unpleasant, or loud way that would tend to reasonably arouse alarm, anger, or resentment in others, the following nonexclusive list of conduct will be criminal in a considerable number of cases under the noisy conduct provision of the ordinance:

- Speaking, marching, and demonstrating;
- Using profane language in front of, or directed to, another person;
- Being insolent and disrespectful to another person;
- Cheering, booing, or taunting at a sporting event or other occasion
  - See Calvert & Richards, *Fans and the First Amendment: Cheering and Jeering in College Sports*, 4 Va. Sports & Ent. L.J. 1, 3, n.9 (2004)

19

(analyzing the constitutionality of efforts to restrict spectators' offensive speech at sporting events held at public colleges and universities and concluding that any policy drafted and implemented by public universities would face an uphill court battle if challenged by free-speech advocates);

- Talking on the phone in public;

- Playing disagreeable or unpleasant music;

- Honking a horn;

- Talking during a movie at the theater; and

- Revving the engine of a vehicle or motorcycle.

Although the list above establishes the noisy conduct provision unconstitutionally applies to a considerable amount of protected activity, our substantial overbreadth standard requires further inquiry. We must determine whether the unconstitutional applications of the noisy conduct provision are substantial when compared to legitimate applications involving unprotected activity. *Williams*, 299 Kan. at 920; see also *Williams*, 553 U.S. at 297.

A review of Kansas cases construing K.S.A. 21-6203(a)(3)—the statute identical to the "noisy conduct" provision in W.M.O. § 5.24.010(c)—leads us to conclude that legitimate applications of the "noisy conduct" provision involving unprotected activity are limited to ones where the disagreeable, unpleasant, or loud conduct consists of threatening behavior that poses a risk of provoking physical confrontation. See *State v. Hughs*, No. 118,281, 2018 WL 2374766, at *1, 4 (Kan. App. 2018) (unpublished opinion) (affirming defendant's disorderly conduct conviction based on evidence of screaming and cursing that resulted in fighting and brawling); *State v. Mead*, No. 115,989, 2017 WL 4082240, at *4-5, 12 (Kan. App. 2017) (unpublished opinion) (affirming disorderly conduct conviction based on evidence that defendant advanced toward others while flailing his arm in the air as he yelled and screamed in an out-of-control, belligerent, threatening, and aggressive manner, after which he battered the witness); *City of Paola v.*

20

*Ammel*, No. 96,301, 2007 WL 2767953, at *3 (Kan. App. 2007) (unpublished opinion) (affirming disorderly conduct conviction based on evidence that defendant screamed insults at police officers at the top of his voice in a public library, which was heard throughout the building, and physically resisted arrest by fighting the officers); *State v. Heyder*, No. 82,810, 2000 WL 36745844, at *1-2 (Kan. App. 2000) (unpublished opinion) (affirming disorderly conduct conviction based on evidence that defendant exited his vehicle at a toll booth, angrily advanced toward the collector while flailing his arms, and spewed profanity in a raised voice at the collector while blocking traffic until he was forcibly taken down and handcuffed by law enforcement); cf. *State v. Kiraly*, No. 125,190, 2023 WL 2941555, at *2, 5-6 (Kan. App. 2023) (unpublished opinion) (holding defendant's use of the phrase "stupid bitch" during an argument where defendant was yelling and woman was sobbing and both were speaking in loud, upset voices did not support arrest for disorderly conduct based on "fighting words" or "noisy conduct tending to reasonably arouse alarm, anger or resentment in others").

The list of cases cited above reveals the narrow scope of legitimate applications, involving unprotected activity, of the "noisy conduct" provision of W.M.O. § 5.24.010(c): noisy conduct consisting of threatening behavior that poses a risk of provoking physical confrontation. The State agrees, citing these same cases to assert that the "'plainly legitimate sweep'" of the "'noisy conduct'" provision is "preventing verbal and physical confrontations between citizens in public places regardless of speech content." The Court of Appeals panel majority also agreed, at least to a certain extent, as shown by its concession that prohibiting "noisy conduct" on its own likely would be constitutionally overbroad. Yet the majority concluded the ordinance survived a facial overbreadth challenge because the ordinance includes actus reus and mens rea components, which the majority believed would significantly curtail its application to protected activity. *Griffie*, 2022 WL 17072292, at *6. With less applications to protected activity, the majority posited the scope of the law's unconstitutional applications would no longer be substantial when compared to its legitimate sweep. But the majority provided no

21

accompanying analysis or other discussion to support its summarily stated belief. 2022 WL 17072292, at \*8.We provide that analysis below.

*Actus reus*

The panel majority held the law's application to protected activity is reined in by what it viewed as restrictive language modifying the actus reus component of the law: "noisy conduct *tending to reasonably arouse alarm, anger or resentment in others*." (Emphasis added.) W.M.O. § 5.24.010(c). *Griffie*, 2022 WL 17072292, at \*6. But we fail to see how the modifying language places any meaningful restriction on the law's application to protected activity. This is especially true given the descriptive modifier is expressed as only "tending" to reasonably arouse alarm, anger or resentment. "Tend" means: "1. To be disposed toward (something). 2. To serve, contribute, or conduce in some degree or way; to have a more or less direct bearing or effect. 3. To be directed or have a tendency to (an end, object, or purpose)." Black's Law Dictionary 1770 (11th ed. 2019). That others may experience alarm, anger, or resentment in response to noisy conduct does not justify the wholesale restriction of free expression. The United States Supreme Court has repeatedly held that "the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers." *Street v. New York*, 394 U.S. 576, 592, 89 S. Ct. 1354, 22 L. Ed. 2d 572 (1969). "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Johnson*, 491 U.S. at 414; see *Coates v. City of Cincinnati*, 402 U.S. 611, 615, 91 S. Ct. 1686, 29 L. Ed. 2d 214 (1971) ("[M]ere public intolerance or animosity cannot be the basis for abridgment of these constitutional freedoms.").

We also disagree with the panel majority that the objective component of the law—tending to *reasonably* arouse alarm, anger, or resentment in others—places any meaningful restriction on the law's application to protected activity. See *Griffie*, 2022 WL

17072292, at *6. As the United States Supreme Court recognized long ago, "a principal 'function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger.'" *Johnson*, 491 U.S. at 408-09 (quoting *Terminiello v. Chicago*, 337 U.S. 1, 4, 69 S. Ct. 894, 93 L. Ed. 1131 [1949]); see *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 210, 95 S. Ct. 2268, 45 L. Ed. 2d 125 (1975) ("Much that we encounter offends our esthetic, if not our political and moral, sensibilities. Nevertheless, the Constitution does not permit government to decide which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer."); *Cohen v. California*, 403 U.S. 15, 21, 91 S. Ct. 1780, 29 L. Ed. 2d 284 (1971) ("[T]he mere presumed presence of unwitting listeners or viewers does not serve automatically to justify curtailing all speech capable of giving offense.").

*Mens rea*

The panel majority believed that adding an intent requirement—"knows or should know"—to the ordinance significantly curtails the law's application to protected activity. *Griffie*, 2022 WL 17072292, at *6.

A general intent mens rea element does not curtail the law's application to protected activity. Whether a person knows (or should know) that such person's noisy conduct is inclined to arouse alarm, anger, or resentment in others does nothing to narrow the scope of the law's application to only unprotected activity. Looking at the broad swath of the law's application to protected activity as described above, it is clear that in most, if not all, cases, the person intentionally, knowingly, or recklessly engaged in the protected activity constituting noisy conduct.

In sum, neither the actus reus nor the mens rea components limit the application of W.M.O. § 5.24.010(c) to protected activity. Given the broad scope of protected activity criminalized by the law, as well as the limited scope of legitimate applications of the provision, we conclude the application to legitimate activity is substantially overcome by the vast amount of protected activity the provision prohibits. As such, we deem the provision unconstitutional.

*Time, Place, and Manner*

Before moving to severance, the final step in our analysis, we consider the dissent's challenge to our conclusion that the noisy conduct provision is unconstitutionally overbroad because it prohibits a substantial amount of protected conduct relative to its plainly legitimate sweep. The dissent does not question the legal framework for conducting a substantial overbreadth analysis. Instead, the dissent argues that a substantial overbreadth analysis is premature until we determine whether the provision lawfully imposes reasonable restrictions on time, place, and manner of protected activity.

The government may impose reasonable restrictions on the time, place, and manner of protected speech. The analysis referred to by the dissent requires that the government's time, place, and manner restrictions (1) be content-neutral, (2) be narrowly tailored to serve a significant governmental interest, and (3) leave open ample alternative channels for communication of the information. *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989) (applying intermediate scrutiny to time, place, and manner restrictions). The narrowly tailored requirement prevents the government from imposing time, place, and manner restrictions that prohibit substantially more protected conduct than necessary to further the government's legitimate interests. 491 U.S. at 799. Notably, the language used by the Court to describe the purpose of the narrowly tailored requirement in a time, place, and manner analysis is strikingly similar

to the language used by the Court to describe the purpose of the substantial overbreadth doctrine. Compare *Ward*, 491 U.S. at 799 (restrictions must be narrowly tailored so time, place, and manner restrictions do not prohibit substantially more protected conduct than necessary to further the government's legitimate interests), with *Broadrick*, 413 U.S. at 615 (substantial overbreadth analysis requires the court to determine whether the challenged law prohibits a substantial amount of protected conduct relative to its plainly legitimate sweep).

Notwithstanding this similarity, the dissent claims our determination that the noisy conduct provision is substantially overbroad is fatally flawed because we failed to first undertake a *Ward* intermediate scrutiny analysis. The dissent's claim focuses on our failure to analyze whether the provision imposed a permissible "manner" restriction on protected conduct. This analysis would require us to decide whether the noisy conduct provision—which criminally punishes a person who makes disagreeable, unpleasant, or loud sounds that the person knows or should know would tend to reasonably arouse alarm, anger, or resentment in others—is narrowly tailored to serve a significant governmental interest. Given the procedural posture of this case, however, the dissent's proposed scrutiny analysis is not possible. The parties have never alleged in these proceedings that the noisy conduct provision is a "manner" restriction on protected speech subject to scrutiny analysis. Because the issue was never litigated, the facts necessary to engage in a scrutiny analysis on appellate review were never developed. Specifically, there is no evidence of the significant governmental interest served by criminally punishing a person who makes disagreeable, unpleasant, or loud sounds that the person knows or should know would tend to reasonably arouse alarm, anger, or resentment in others. Obviously, we cannot evaluate whether restrictions on the manner in which protected activity is expressed are narrowly tailored to serve an unspecified and factually unsupported significant governmental interest.

Yet the dissent suggests we can engage in appellate review because the provision is really just a typical noise ordinance intended to govern sound, similar to the many that are challenged in other courts under an intermediate scrutiny analysis. But there is no evidence to suggest the noisy conduct provision here was enacted to govern sound. To the contrary, the City's noise ordinances governing sound are provided in detail under sections within the Noise Chapter of the Municipal Code. W.M.O. Chapter 7.41 - Noise. The sections in this chapter enumerate a non-exclusive list of noise nuisances, identify the tests for measuring noise, and set forth the decibel levels for time periods and zones at which noises will be declared excessive, unusual, loud, and unnecessary. W.M.O. § 7.41.010-§ 7.41.060.

Simply put, we are precluded from engaging in a sua sponte scrutiny analysis of the noisy conduct provision as proposed by the dissent. Thus, we remain resolute in concluding that the noisy conduct provision is unconstitutionally overbroad because it prohibits a substantial amount of protected conduct relative to its plainly legitimate sweep.

3. *Severance*

Because we have declared unconstitutional the "noisy conduct" provision of W.M.O. § 5.24.010(c), we now must decide whether there is a satisfactory method of severing the law's constitutional provisions from its unconstitutional provisions. The touchstone for severability is legislative intent, which is determined by applying our well-established two-part test. Under this test, the court may sever the unconstitutional provisions from the law and leave the remainder in force and effect if, after examining the law, we can conclude (1) the Legislature would have passed the law without the objectionable portion and (2) the law would operate effectively to carry out the intention

26

of the Legislature with the objectionable portion stricken. *Trotter*, 316 Kan. at 321 (quoting *Gannon v. State*, 304 Kan. 490, 519, 372 P.3d 1181 [2016]).

In this case, the introductory General Provisions of the Wichita, Kansas, Code include a catchall severability clause. See W.M.O. § 1.04.050 ("If for any reason any part, section, subsection, sentence, clause or phrase of this Code, or the application thereof to any person or circumstance, is declared to be unconstitutional or invalid such decision shall not affect the validity of the remaining portions of this Code."). Although a severability clause is not dispositive, it is a strong indication of legislative intent and creates a presumption of severability. *Gannon*, 304 Kan. at 520 (citing *State v. Next Door Cinema Corp.*, 225 Kan. 112, 118-19, 587 P.2d 326 [1978]).

We begin the severability analysis by examining what W.M.O. § 5.24.010(c) would look like without the unconstitutional provision:

> "Disorderly conduct is, one or more of the following acts that the person knows or should know will alarm, anger or disturb others or provoke an assault or other breach of the peace:

> "(a) Engaging in brawling or fighting; or

> "(b) Disturbing an assembly, meeting, or procession, not unlawful in its character; or

> "(c) Using fighting words. ~~or engaging in noisy conduct tending to reasonably arouse alarm, anger or resentment in others.~~

> "As used in this section, 'fighting words' means words that by their very utterance inflict injury or tend to incite the listener to an immediate breach of peace."

By its plain language, the ordinance reflects the City's intent to protect physical safety and preserve public peace (preventing "an assault or other breach of the peace"). If we sever the unconstitutional provision criminalizing "noisy conduct tending to

27

reasonably arouse alarm, anger or resentment in others" from subsection (c), the subsection still criminalizes unprotected "fighting words" as an act of disorderly conduct. The ordinance defines "fighting words" as ones which "by their very utterance inflict injury or tend to incite the listener to an immediate breach of peace." Because fighting words, by their very nature, tend "to reasonably arouse alarm, anger or resentment in others," the fighting words provision necessarily embraces what we found above as the legitimate sweep of the "noisy conduct" provision:  threatening behavior that poses a risk of provoking physical confrontation.

For this reason, we conclude (1) the lawmakers would have passed the ordinance without the "noisy conduct" provision and (2) the ordinance will operate effectively to carry out the intention of the lawmakers—protecting physical safety and preserving public peace—with the "noisy conduct" provision stricken. Having met the two-part test, we sever the "or engaging in noisy conduct tending to reasonably arouse alarm, anger or resentment in others" language from W.M.O. § 5.24.010(c).

Judgment of the Court of Appeals affirming the district court is reversed. Judgment of the district court is reversed.

* * *

STEGALL, J., dissenting:  In my view, the majority's analysis is sound, with one crucial exception. After describing the appropriate overbreadth test, the majority fumbles the ball when determining whether the challenged portion of the ordinance sweeps up protected speech in its net. The extent of the analysis is simply the conclusory statement that "[b]y its plain language then, the 'noisy conduct' provision of W.M.O. § 5.24.010(c) necessarily criminalizes conduct previously deemed by the United States Supreme Court as protected by the First Amendment, if accompanied by a disagreeable, unpleasant, or loud sound." *City of Wichita v. Griffie*, 318 Kan. ___, slip op. at 17.

28

At first glance, this sounds reasonable enough. But couldn't the same be said of every time, place, or manner restriction on speech? Indeed, it could. See, e.g., *Hill v. Colorado*, 530 U.S. 703, 731-32, 120 S. Ct. 2480, 147 L. Ed. 2d 597 (2000) ("[I]t is not disputed that the regulation affects protected speech activity; the question is thus whether it is a 'reasonable restrictio[n] on the time, place, or manner of protected speech.' Here, the comprehensiveness of the statute is a virtue, not a vice, because it is evidence against there being a discriminatory governmental motive. . . . [The statute] simply does not 'ban' any messages, and likewise it does not 'ban' any signs, literature, or oral statements. It merely regulates the places where communications may occur. [Citation omitted.]"); *Boos v. Barry*, 485 U.S. 312, 331, 108 S. Ct. 1157, 99 L. Ed. 2d 333 (1988) (applying a narrowing construction to limit application of the law to regulate the place and manner of demonstrations directed at an embassy rather than a general breach of the peace law); *Carew-Reid v. Metropolitan Transp. Authority*, 903 F.2d 914, 916-19 (2d Cir. 1990) (finding a regulation banning use of amplifiers by musicians on subway platforms a permissible time, place, and manner restriction, despite the fact that "music, as a form of expression, is protected by the First Amendment," because the First Amendment "does not guarantee appellees access to every or even the best channels or locations for their expression"; even though the regulation banned a particular medium, it remained "neutral with regard to the expression's content," and though the "incidental effect of the amplifier ban, obviously, is that those musicians who previously used amplifiers on subway platforms will be forced to alter their performances or to perform elsewhere . . . this restriction on the manner of their expression is justified because it is the manner itself that produces the evil that is the object of regulation").

Time, place, or manner restrictions on speech occupy a unique place in our First Amendment jurisprudence. Where there is a legitimate time, place, or manner restriction, even though it will of course have the effect of limiting otherwise protected speech, it cannot as a matter of law infringe on that speech. The phenomenon of a valid time,

place, or manner restriction reaching otherwise protected activity is nothing new, and the Supreme Court has addressed this reality for decades. See, e.g., *Hill*, 530 U.S. at 731-32 (evaluating regulations under a time, place, and manner analysis and acknowledging that while some regulations will obviously "affect[] protected speech activity" they may pass constitutional muster as a content neutral time, place, and manner restriction that lacks any "discriminatory governmental motive"); *Ward v. Rock Against Racism*, 491 U.S. 781, 791-93, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989) (noting that while plaintiff's arguments about government interference in "artistic judgment may have much force in other contexts"—because "[a]ny governmental attempt to serve purely esthetic goals by imposing subjective standards of acceptable sound mix on performers would raise serious First Amendment concerns"—"they are inapplicable to the facts of this case" because the record clearly showed the city had only content-neutral goals). For a law to be unconstitutionally overbroad, we must consider whether a law reaches a substantial amount of protected activity. *Hill*, 530 U.S. at 731-32 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S. Ct. 2908, 37 L. Ed. 2d 830 [1973] ["[P]articularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep."]). Otherwise, no time, place, or manner restriction could survive the kind of overbreadth challenge plaintiff brings in this suit.

But the majority never conducts an analysis of W.M.O. § 5.24.010(c) as a time, place, or manner restriction. Maybe it would fail to meet the necessarily high threshold required for such restrictions. Indeed, "noise ordinances" are widely categorized as "fall[ing] into the category of time, place or manner regulations." *Sharkey's, Inc. v. City of Waukesha*, 265 F. Supp. 2d 984, 994 (E.D. Wis. 2003). And even very broad noise ordinances—similar to the one at hand—have been upheld as legitimate "manner" restrictions. See *Costello v. City of Burlington*, 632 F.3d 41, 44 (2d Cir. 2011) (upholding city noise ordinance that made it "unlawful for any person to make or cause to be made any loud or unreasonable noise," defined as noise that "disturbs, injures or endangers the

30

peace or health of another or when it endangers the health, safety or welfare of the community"); *Howard Opera House Assocs. v. Urb. Outfitters, Inc.*, 131 F. Supp. 2d 559, 563 (D. Vt. 2001) (upholding city noise ordinance that banned "any loud or unreasonable noise," defined as noise which "disturbs, injures or endangers the peace or health of another, or which endangers the health, safety or welfare of the community"), *aff'd* 322 F.3d 125 (2d Cir. 2003); *DA Mortg., Inc. v. City of Miami Beach*, 486 F.3d 1254, 1267-68 (11th Cir. 2007) (upholding city noise ordinance that proscribed unreasonably loud noise "in such a manner as to disturb the peace, quiet and comfort of neighboring inhabitants, or at any time louder that is necessary for convenient hearing for the person or persons who are in the room"); *City of Beaufort v. Baker*, 315 S.C. 146, 149, 432 S.E.2d 470 (1993) (upholding city ordinance that made it "unlawful for any person to willfully disturb any neighborhood or business in the City by making or continuing loud and unseemly noises, or by profanely cursing and swearing, or using obscene language"); *State v. Holcombe*, 145 S.W.3d 246, 248 (Tex. App. 2004) (upholding a city noise ordinance that made it illegal for one to "unreasonably disturb or interfere with the peace, comfort and repose of neighboring persons of ordinary sensibilities"), *aff'd* 187 S.W.3d 496 (Tex. Crim. App. 2006).

Other courts have come down differently, so the answer is not at all self-evident. See *Deegan v. City of Ithaca*, 444 F.3d 135, 144 (2d Cir. 2006) (regulations prohibiting sound that could be heard 25 feet from its source in downtown pedestrian mall were not narrowly tailored to serve city's legitimate interest in preventing unreasonably injurious, annoying, or disturbing sound because mall was a public forum already "bustling with the sounds of recreation, celebration, commerce, demonstration, rallies, music, poetry, speeches, and other expressive undertakings," and therefore its application to a street preacher "unreasonably burden protected speech"); *United States v. Doe*, 968 F.2d 86, 87 (D.C. Cir. 1992) (a national park's regulation that prohibited sounds from "audio devices" generating a higher than prescribed decibel level was not a constitutional time, place, and manner restriction); *Campa v. City of Birmingham*, 662 So. 2d 917, 918-19 (Ala. Crim.

31

App. 1993) (finding a noise ordinance "unduly restrictive because the only restriction it places on the offending sounds is that they not 'disturb the peace, quiet and comfort of neighboring inhabitants'" and these factors were not limited to a "specific time frame, a specific place, or a specific manner in which sound can be emitted").

The majority responds to this criticism by quite rightly asserting that the State has never defended the ordinance as a manner restriction and has proffered no significant government interest as its rationale. I don't begrudge the majority's refusal to do the State's work for it; however, I would exercise our discretion to order the parties to provide supplemental briefing on the question. After all, when important issues such as this arise affecting major questions that will likely have ramifications on the law outside any particular dispute, our recent practice has been to do just that. See, e.g., *State v. Patton*, 315 Kan. 1, 5, 503 P.3d 1022 (2022) (ordering supplemental briefing on whether application of statutory amendments violated the Ex Post Facto Clause); *State v. Sayler*, 306 Kan. 1279, 1280, 404 P.3d 333 (2017) (ordering supplemental briefing to address what effect new Kansas caselaw regarding sufficiency of charging documents may have).

In my view, our refusal to do so here may not do much damage in today's case, but it may do a real disservice to legitimate time place or manner restrictions on the books in towns and counties across our state. This is so because how this particular noise restriction—which is admittedly quite broad—would fare under a proper time, place, or manner review is uncertain at best. And as I have explained, the question must be answered before any overbreadth analysis can proceed. Given all this, I am left with only the option to dissent.